## UNITED STATES v. O'BRIEN et al.

### (Circuit Court, S. D. New York. July 1, 1896.)

**1. NEUTRALITY LAWS—ENLISTING IN FOREIGN ARMIES.**

Our neutrality laws (Rev. St. §§ 5282, 5286) prohibit any person from enlisting in this country as a soldier of any foreign power. They also prohibit any person from hiring or retaining any other person to enlist or to go abroad for the purpose of enlisting. But they do not prohibit persons within our jurisdiction, whether citizens or not, to go as individuals to foreign states, and there enlist in their armies.

**2. SAME—MANNER OF GOING ABROAD TO ENLIST.**

It being lawful for individuals to go abroad to enlist, they may go in any number and in any way they see fit, by regular lines of steamers, by chartering a vessel, or in any other manner, either separately or associated; provided, always, that they do not go as a military expedition, or set on foot or begin within our jurisdiction a military expedition or enterprise, to be carried on from this country, or provide or prepare the means therefor.

**3. SAME—MILITARY EXPEDITION.**

Some of the prominent marks of a military expedition or enterprise, which are forbidden by the statute, are concert of action; a combination and organization among the men to act together; the presence of arms or weapons, which can be used for a military purpose; and, ordinarily, some direction or command. But it is not necessary that the men shall be drilled or organized according to military tactics, as infantry, cavalry, or artillery.

**4. SAME—PREPARATION AND TRANSPORTATION OF MILITARY EXPEDITION.**

If a military expedition or enterprise has in fact been prepared in this country, and carried by sea to a foreign shore, then all persons who planned for it or prepared for it here, or knowingly took part in the transportation of it, are guilty, under the statute.

**5. SAME.**

If the owner of a vessel provides and furnishes her, knowing that she is to be used for the transportation to a foreign country of an organized body

of men, intending to act together in a concerted military way, and with arms, he is guilty of a violation of the statute.

**6.** SAME—TRANSPORTATION.

It is no offense, under the neutrality laws, to transport persons intending to enlist in foreign military service out of this country, and land them in such foreign country, provided they go merely as individuals, and not as a military expedition.

**7.** SAME—TRANSPORTATION OF WAR MATERIAL AND MEN.

It is no offense against the laws of the United States to transport, from this to a foreign country, arms, ammunition, and materials of war, either alone or together, in the same ship, with men who intend to enlist, provided they are not a part of or in aid of any military expedition or enterprise set on foot in this country. In such case the persons transported and the shipper and transporter only run the risk of capture, and the seizure of such arms and munitions by the foreign power against which the arms are intended to be used.

**8.** SAME—EVIDENCE—MYSTERY AND SECRECY.

In such case, mystery and secrecy in the preparation and conduct of the voyage—even the taking of a false oath by the master in connection with the clearance papers—are not conclusive of the illegality of the enterprise under our neutrality laws, but are as consistent with legality as illegality; as these precautions may only be used to avoid attack and capture by the foreign power against which the arms, etc., are intended to be used.

**9.** SAME—MILITARY EXPEDITION.

The fact that men intending to enlist, and arms and munitions designed to be used, against a foreign power, are carried in the same ship, and landed in such foreign country, and that the men there handle and carry the arms and munitions, is not of itself absolutely conclusive of a military expedition; it being possible that the men may intend to act merely as individuals, and simply as porters of the arms. In such case the existence of a military expedition is one of fact for the jury.

**10.** SAME—PROVINCE OF JURY—CONSIDERATION OF EVIDENCE.

In determining whether an expedition transported to a foreign country was a military expedition, in the meaning of the neutrality laws, and in ascertaining what knowledge the defendants had of it, the jury are to consider, not single circumstances alone, but all the circumstances together, the whole sequence of events, to ascertain whether there was merely a use of accidental opportunity, or such a successive order of events as shows prearrangement and concert.

This was an indictment against O'Brien and others for violating the neutrality laws of the United States, by taking part in the preparation and transportation of an alleged hostile military expedition directed against the power of the King of Spain in the Island of Cuba.

Wallace Macfarlane, U. S. Atty., and Jason Hinman and Max J. Kohler, Asst. U. S. Attys.

H. S. Rubens, John F. Lewis, and W. W. Kerr, for defendants.

BROWN, District Judge (charging jury). I have been requested, gentlemen, to present to you a very considerable number of charges. Before doing so I shall say something upon the case in general and will return to those hereafter.

The case is an important one, because it involves an important principle having reference to our relation to foreign powers. The object of the series of laws, of which this is a part, was to prevent complications between this government and other nations. It was intended to do this by making criminal such acts as are calculated to embroil us with other nations. Within five years after the adop-

tion of the constitution, so long ago as 1794, these enactments were found necessary, and the law then passed is substantially the same as it exists to-day. In 1818 it was revised by a few changes of words here and there, not affecting the section under which this indictment has been found. In the Revised Statutes of the United States, adopted in 1874, the same provisions were incorporated and are now referred to by sections under this act. Section 5282 deals with the enlistment of individuals. Section 5286, under which this indictment was brought, deals with military expeditions. Section 5283 deals with armed cruisers designed to commit hostilities in favor of one foreign power as against another with which we are at peace. Section 5282 prohibits any person from enlisting in this country as a soldier in the service of any foreign power. It also prohibits any person from hiring or retaining any other person to enlist or to go abroad for the purpose of enlisting; but it does not prohibit any person, whether he is a citizen or not, from going abroad himself for the purpose of enlisting in a foreign army. By our legislation, therefore, on this subject, as it appears from this statute, our law thus negatively permits individuals to go to foreign countries to enlist. That I regard as of some importance in the construction which we should give to section 5286 under which this indictment is found, for 5286 is a part of the same law originally passed in 1794. As that was dealing with the whole subject, I cannot help regarding the law, framed as it is, as designedly leaving the field open to all persons within our jurisdiction, whether citizens or not, to go to foreign states and enlist in their armies if they choose to do so. As this, therefore, is by our law rightful and lawful for 1 man, so it is lawful for 10 men or 20 men or 100 men. It is a necessary incident to this lawful right that men may go abroad for this purpose in any way they see fit. They may go as passengers by regular lines of steamers, or by chartering a steamer, or in any other way they choose, either separately or associated, provided, and so long as, they do not go as a military expedition, nor set on foot nor begin any military expedition or enterprise; for that is what section 5286 prohibits. We are, therefore, to consider these two sections as opposed to each other, or as providing for different classes of cases. It is the military expedition or enterprise alone that is prohibited by our law. The language of that section is that every person who, within the jurisdiction of the United States, begins or sets on foot or provides or prepares the means for any military expedition or enterprise to be carried on from thence, that is to say, from this country, shall be guilty of a high misdemeanor. While, therefore, the right of individuals to go abroad for the purpose of enlisting is undoubted, they must not go as a military expedition or as a military enterprise. They must not form, begin or set on foot any military expedition or enterprise to be carried on from this country, or provide or prepare the means therefor. Now these four defendants stand charged with having violated this section by having begun or set on foot, or having provided or prepared the means for, a military expedition or enterprise to be carried on from this country. The first question is whether there was, as it appears to you upon the

whole evidence, a military enterprise or a military expedition; or was this merely a lawful act, by which individuals merely were transported as passengers, and merchandise consisting of military material was transported as merchandise, destined for Cuba, but under circumstances and in a way which did not constitute a military expedition or military enterprise? So long ago as 1807, not long after this statute was passed, Chief Justice Marshall, who has been by all considered as one of the highest lights, if not the highest light in our legal history, in some comments upon this statute, said that there was "a lack of precision, in defining the offense" under this particular statute—defining what was a military expedition or enterprise—"which might make difficulty in its application to particular cases." This arises from the generality of the language; and it will be for you, with such light as the court can afford, to say in the first place whether this was an expedition or enterprise of a military character; or whether on the contrary, looking at it from the light of all the evidence which you have received, it was merely a lawful transportation of merchandise and transportation of passengers, although those passengers may have intended ultimately to join the Cuban army? Because at the outset I must say to you, that the mere intent of passengers to join the Cuban army, will not alone make a military expedition or enterprise out of a transportation which does not contain any other military feature. What then are the marks, or some of the marks, of a military enterprise or expedition, as distinguished from what I might call a miscellaneous group of persons transported to Cuba and going with the individual intention of enlisting in the Cuban army when they get there? I must say to you, what I think will occur to every one of you, that one of the most prominent marks of a military enterprise is that there is concert of action, that there is some kind of combination and organization among the men to act together, to stand together. That is our first conception of a military operation. Next, there must be arms or weapons which can be used for military purposes; and ordinarily there is needful some direction. A miscellaneous body of men although they might intend to act for a common purpose, cannot very well act in a military way unless there is some direction, some leadership; in other words, some command. Now if you find indications of those three things, or of the first two alone perhaps, you will have at least some marks of a military enterprise. That is to say, if you find that there is a combination of the men to stand by each other, and you find them with military weapons prepared to act in concert, these are marks of a military enterprise, as distinguished from that of individual passengers, or a company of individual passengers merely going each upon his own account. Accordingly in all indictments which have been brought under this law the circumstance of a combination among the men, an organization of some sort, is first insisted upon. And to that effect I read a few passages to you from the opinion of the Supreme Court, very recently delivered, in the case of The Horsa, sailing from Philadelphia and having delivered a number of passengers who were armed and equipped somewhat as in this case; and upon appeal the Su-

preme Court (Wiborg v. U. S., 16 Sup. Ct. 1134), through Chief Justice Fuller, stated as follows:

"The definitions of the lexicographers substantially agree that a military expedition is a journey or voyage by a company or body of persons, having the position or character of soldiers, for a specific warlike purpose; also the body and its outfit; and that a military enterprise is a martial undertaking, involving the idea of a bold, arduous, and hazardous attempt. The word enterprise is somewhat broader than the word expedition; and although the words are synonymously used, it would seem that under the rule that its every word should be presumed to have some force and effect, the word enterprise was employed to give a slightly wider scope to the statute."

Further along the Court in quoting say again:

"If the persons referred to had combined and organized in this country to go to Cuba and there make war on the government, and intended when they reached Cuba to join the insurgent army and thus enlist in its service, and the arms were taken along for their use, that would constitute a military expedition, and the transporting of such a body from this country for such a purpose would be an offense against the statute."

Again, the Court approves the charge of the Court below, in these words:

"Any combination of men organized here to go to Cuba to make war upon its government, provided with arms and ammunition, we being at peace with Cuba, constitutes a military expedition. It is not necessary that the men shall be drilled, put in uniform, or prepared for efficient service, nor that they shall have been organized according to the tactics or rules which relate to what is known as infantry, artillery or cavalry. It is sufficient that they shall have combined and organized here to go there and make war on a foreign government, and to have provided themselves with the means of doing so."

Still further, the Chief Justice in his own language states that:

"If they intended to stand together and defend themselves if necessary, the jury had a right under the circumstances stated to find that this was a military expedition or enterprise under the statute."

Now, I have read these several passages, (and they are the most important that bear upon this point), to illustrate what I think all agree is the first requisite to constitute a military enterprise or expedition, namely, a combination of men having in view some military purpose and provided with means for effecting it. In this case we may as well transport ourselves down to the time of the landing of these men at Cuba, and from that point proceed backwards, because if you are not satisfied from this evidence that when they left the ship and went on Cuban soil they were there acting as a military expedition and constituted a military enterprise, there is nothing before which will amount to that. You have then to determine, first, whether the body of men that you find going upon this steamer and landing, in the way you have heard detailed in the evidence, were acting in concert, and in such a way that you feel constrained to find that they had organized and combined together to do as they did, having arms in their hands. I say that, because there is no dispute about it, there is no contradiction in the testimony and there is no reason to discredit the fact that the men went each with a rifle that had been given to him for himself, with the other bundles of rifles and the other ammunition which you have heard detailed; each armed with his rifle, with a revolver, so far as they would go around, with a cartridge box containing ammunition,

and with a knapsack. Now if those men, in the language of the Chief Justice, in landing in that way "intended to stand together and defend themselves if necessary," if that is the meaning of the landing in the way that they did and at the time they landed, that was certainly a military enterprise. They were prepared to act in a military manner, associated in a military form; and that is the first question for you to determine, whether you place that construction and give that meaning to the landing which they then made, or whether you feel warranted in giving it any different construction, which does not amount to any military intent or any intent to defend themselves or to act in any military way. If it was the intention of these men to combine, to act as a body together, to defend themselves if necessary, that plan was of course formed at some time, and your next question will be was it purely an afterthought, or was it a part of the original design? It must have been one or the other. It is for you to say upon all the evidence what you think of that. Is there any evidence that it was an afterthought? Or on the contrary, are there such evidences of preparation from point to point, from step to step, as satisfy you that it was a prearranged plan; and that the different parts succeeded each other in such natural succession, as to convince you beyond a reasonable doubt that it was a part of the original scheme? If so, the remaining question for you to determine is whether these defendants understood that, whether they were privy to it, or whether it was wholly foreign to their knowledge or intention or expectation. If it was, then they are not chargeable. If they were privy to it, understood it or planned it or provided for it, then they are guilty, and it is your duty to convict either one that you shall so find to be privy in providing and preparing these means. If you find that this was a military expedition in the sense in which I have described it, and that it was prepared when the men started, that that was what was designed when the men started, then as a military enterprise of that kind it was essential of course that the body of men who had combined should be transported and enabled to land; and the transportation is itself a providing of means for the expedition, within the statute, on the part of all who knowingly took part in it. The language of the Supreme Court on that point is very clear. Said the Chief Justice:

"We think that it does not admit of serious question that providing or preparing the means of transportation for such a military expedition or enterprise as is referred to in the statute is one of the forms of provision or preparation therein denounced. Nor can there be any doubt that a hostile expedition dispatched from our ports is within the words 'carried on from thence.' The officers of the *Horsa* were concerned in providing the means of transportation."

In that case, however, the Supreme Court declared that the mate of the vessel was not responsible, for the reason that it appeared that he had no knowledge of the intention of the expedition and acted solely under the orders of the captain. There was testimony on the part of the defense to that effect, which was not contradicted. The Supreme Court therefore gave effect to that evidence by declar-

ing the mate, who acted without knowledge of the intent as not guilty. That must be your rule in this case. If then you shall find as I have said before, that here was a hostile enterprise, a combination of persons with a hostile intent, such as I have described, if you find that either of these defendants knew of that, and planned for it, and took part knowingly in the transportation, the one that you so find knowingly taking part, it is your duty to find guilty. Three of these defendants were on board the Bermuda, Captain O'Brien, the mate, Murphy, and Mr. Nunez. I do not think it is necessary for me to go over the details of the evidence, they have been so fully commented upon by the counsel. Captain O'Brien was the master of the expedition. It is for you to say whether there was anything new made known to him after he left New York, whether there is any evidence of that whatsoever, and whether what he did was not, and must have been, in consequence of his knowledge at the time he sailed from New York. If so, that convicts him. As regards Murphy, the evidence is that he took on board eight men, who were at first ostensibly made a part of the crew, but when the vessel sailed they ceased to take any part in the work of the ship and were treated as passengers, and were lodged in the second cabin. That I believe is the testimony. Now with regard to Murphy the test is the same; if when he brought those men on board he understood what was the design of the expedition, and if you find that this was a military expedition in the sense in which I have described it, then the mate Murphy did know what it was, and by taking part knowingly in the transportation as mate, he made himself liable.

With regard to Nunez, he, it appears, had charge of the cargo. It is for you to say whether the distribution of the arms that was made there was made in any way against his intent or against his expectation, or whether the irresistible inference is that it was in accordance with his expectation and arrangement.

As regards Mr. Hart, he was the owner, the managing owner I should say, of the vessel, arranging as such her voyage, providing her master and, as is shown, watching personally more or less the details about the sailing, and in communication with the master up to the last moment before she sailed. If he knowingly provided this vessel for the purposes of this transportation, and if you find that this transportation, as I have said, was not simply a commercial transportation of merchandise, or a transportation of passengers individually on their own account, but he knew that it was designed for the transportation of an organized or combined body of men intending to act together, in a concerted military way and with arms; if he knew that, and the vessel was sent out and planned for that, Mr. Hart is responsible for it.

I come now to these requests to charge. They are somewhat numerous, and I have made, as shortly as possible, a general statement. I shall have some few comments to make, as I proceed, upon these various requests, which I suppose I am bound to consider seriatim.

First, I charge as requested, that it is not a crime or offense against the laws of the United States, under the neutrality laws of

this country, for individuals to leave this country with intent to enlist in foreign military service.

Second, as I am asked, I charge, that persons desiring to enlist in foreign military service may lawfully go abroad for this purpose in any way they see fit, either as passengers, by a regular line steamer or by any steamer bound for the desired destination, by chartering a steamer, or in any manner they choose, either separately or in association for the purpose of facilitating transportation. I say this provided they do not form or set on foot any military expedition or enterprise, or procure or prepare the means therefor.

As requested I also say that it is no offense against the laws of the United States to transport persons intending to enlist in foreign military service out of this country and land them in such foreign country—under the same qualifications as I have just stated.

It is no offense against the laws of the United States to transport arms, ammunition, and munitions of war from this country to any foreign country, as merchandise only, if not designed in aid of a military expedition from this country, whether they are to be used in war or not. In such case, the shipper and transporter of the arms, ammunition and munitions of war only run the risk of capture and seizure of such arms, etc., by the foreign power against whom they are intended to be used.

As requested I also state, with modifications, as follows: that it is no offense against the laws of the United States to transport persons intending to enlist in foreign military service, and arms and munitions of war on the same ship, provided they are not a part of, and are not in aid of, any military expedition or enterprise set on foot in this country. In such case the persons transported and the shipper and transporter of the arms and munitions of war only run the risk of capture and seizure of such arms and munitions by the foreign power against whom the arms were to be used and the persons transported intend to enlist.

Again, I charge that inasmuch as it is legal and lawful to transport men and munitions of war to the scene of belligerent operations, under the conditions above stated, and those engaged run the risk of capture, secrecy and mystery in the conduct of the business are lawful, as a protection from surprise and capture.

Again, the shipping of the arms at New York, receiving the boats off Chintogeague, and taking on the passengers off Tuckahoe or other acts done in the furtherance of secrecy do not necessarily and in and of themselves give an illegal character to the enterprise.

Mystery and secrecy in the conduct of the voyage are inconclusive —are as consistent with a lawful as with an unlawful enterprise.

In regard to these three last requests I add a word or two in explanation; that inasmuch as the object, as the transportation of passengers and merchandise in a perfectly lawful way would be accompanied with danger, therefore it is only the part of prudence in those who would wish to conduct a perfectly lawful enterprise to be cautious, careful and to take all the means of secrecy possible to prevent the anticipation and thwarting of the enterprise in this country by the Spanish powers. Therefore the mere fact of secrecy or mystery

that might hover around such enterprises, does not of itself give it an unlawful character. Whether lawful, of that sort, or whether it be an unlawful undertaking as a military enterprise in fact, there is still equal need in either case of care, of prudence, of secrecy, so far as secrecy is possible. In that sense these circumstances of secrecy and mystery, of endeavors to throw the public even, and particularly the Spanish powers from whom they have to fear danger, off the track, are to be expected and are justifiable, if the enterprise is justifiable. So far then the circumstances of mystery and secrecy are inconclusive and as consistent with legality as with illegality. In and of themselves therefore they do not prove anything as to the character of the expedition.

I am further requested to charge that in regard to the clearing of the Bermuda for Vera Cruz and the false oath which seems to have been taken by the master, he is now only to be tried on the indictment before us, and not for any other alleged violation of law. That of course you understand. A false oath is in itself an independent crime. He is not on trial for that. The weight of that circumstance before you is simply the weight of any other circumstance of secrecy or endeavor to hide the object of the Bermuda when she left New York. That is, whether this was given in pursuance or in furtherance of what might be legal, or whether to aid an illegal enterprise, it is not determined by that circumstance.

I am also asked to charge that the fact that the Bermuda sailed from New York with a cargo of arms and munitions of war, and afterwards, off the New Jersey coast, took on board a number of unarmed men, is not alone sufficient to justify a conviction, even if the arms were intended for use by the Cuban army and the men intended to enlist in that army on arrival. That I charge, but only with the provision that you find that there was no combination or organization of the men to act together, in any military way, before joining the Cuban army. If you find that, then the mere fact that they took the men on board off Ocean City, as passengers, that they took arms on board to be transported as merchandise, those facts alone, without the other, would not constitute an offense. In saying this I only repeat, so many times over, that the essence and substance of this whole charge depend on whether you find that there was a combination or concert of action or organization among these men to act together, to stand together, for the purpose of effecting their landing in Cuba and reaching the Cuban army. The expedition from this country, the unlawful expedition, the military expedition referred to in the statute, is not their fighting in Cuba when they get there, but is in the means taken to join the Cuban army and the manner of doing it.

"The fact that (the men and arms having a common destination) the men undertook the transportation of the arms, opened the packages and arranged the contents for convenient carriage, does not alone constitute them a military expedition;"—I am requested to charge that and I cannot pass over this request. It is very ingeniously worded. I say that it would be barely possible that men might land, that they might carry muskets, that they might handle

packages of arms, and still not constitute a military expedition. That would depend entirely upon the evidence. They might possibly intend to act as porters simply. If you believe that these men were not designing to act together as a combination of men, but were acting individually, simply as porters of arms without any combination, or without any intent to defend themselves at all if anybody should attack them, you would be authorized to find that that did not constitute a military expedition, from those facts. But it is for you to put your interpretation as reasonable men upon the facts which have been given in evidence.

I am further requested to charge, and do charge you, that unless the jury are satisfied beyond a reasonable doubt that at the time the men left this country there was a combination of the men for a military purpose with the understanding and intention that they should become a military body before reaching the scene of action, their verdict must be for the defendants. I so charge; but I add that if you find there was such a combination, and that the men landed with arms from the Bermuda and intended to stand together and defend themselves if necessary, you are authorized to find that this was a military expedition or enterprise carried on from this country.

Again, I am asked to charge that even if the jury are satisfied beyond a reasonable doubt that, before starting, there was a combination by the men, who embarked on the Bermuda, for a military purpose with the agreement and intention that they should become a military body before reaching the scene of action, still their verdicts must be for the defendants, unless they shall also be further satisfied beyond a reasonable doubt that the defendants knew of such combination, agreement and intention before the ship sailed. In substance I say "Yes" to that request; but it is only necessary that the defendants shall have known of the general plan, not of the specific acts which may have been done under it; and "if you are satisfied beyond reasonable doubt that there was such a combination, for the purposes above stated, still the defendants are not liable unless they knowingly and intentionally provided the means for transportation, or equipping it before the Bermuda sailed." That is the same in substance as I have said before.

Again, "if without previous combination, agreement and intention, the men taken on board the Bermuda, after embarkation, organized themselves into a military body and supplied themselves with arms from the cargo, without right, and contrary to the previous intention or expectation or arrangement of the defendants, then your verdict must be for the defendants"; because upon this hypothesis, the defendants would not be privy to these acts.

I think I have already in substance said that "if the facts proved are as consistent with a lawful as with an unlawful purpose, act or intention, the presumption of innocence must prevail, and the verdict must be for the defendants.

"The burden is upon the government to exclude by proof every reasonable hypothesis consistent with innocence. In other words, you must give the defendants the benefit of every reasonable doubt."

"As to so much of the evidence as is circumstantial, it is not a ground of conviction except in so far as it points toward guilt and is inconsistent with innocence."

There are a few other requests to charge by the defendant Nunez separately:

"It is not a crime or offense against the United States for individuals to leave this country with the intent to enlist in foreign military service, nor is it an offense against the United States to transport persons out of this country and to land them into foreign countries, even though such persons have the intention to enlist in foreign armies."

"It is no offense against the laws of the United States to transport persons intending to enlist in foreign armies, and arms and munitions of war on the same ship; in such case the persons transported and the shipper and transporter of the arms run the risk of seizure and capture by the foreign powers against whom the arms were to be used, and against whom the persons and passengers intended to enlist; but such cause would not constitute an offense against the laws of the United States, and for such cause the defendants cannot be found guilty, unless you find that there was a combination to engage in military acts and to act in a military way before they reached the insurgent army."

"Before the jury can find the defendants guilty under this indictment they must first find that there was a military expedition or enterprise against the territory of the King of Spain. A military expedition or enterprise does not exist unless there is a combination or organization of some kind, for some kind of military and hostile operation, and it is the duty of the government to satisfy you beyond a reasonable doubt that such a combination or organization was effected or planned in the United States, and that the defendants had knowledge of such an intended combination and provided means for transporting it to Cuba."

"The defendants cannot be convicted under the indictment in this case for any new and independent act performed on the Bermuda after the vessel reached the high seas beyond the three mile limit from the shores of the United States, or for any independent act that was not performed within the Southern District of New York; provided such acts were neither designed nor expected nor contemplated by the defendants. They are responsible for the acts done on the Bermuda in pursuance and fulfillment of the previous plans and expectations of the defendants."

"It is the duty of the government to prove to the jury beyond a reasonable doubt that the offenses alleged in the indictment, or one of them, were committed by the defendants within the Southern District of New York, and if the proof fails in this respect the defendants must be acquitted."

"If the jury find that the circumstances relied on to show guilt are as compatible with the theory of innocence, or of an innocent undertaking, as with the theory of a prohibited undertaking, it is the duty of the jury to find the defendants not guilty; and the very fact that the circumstances are compatible with an innocent undertaking make a situation of doubt and reasonable doubt the benefit of which must be given to the defendants.

"Merely landing men and arms and ammunition in Cuba, contrary to and in disregard of the laws of Spain, would not be an offense against the laws of the United States, and for such act these defendants, or either of them, could not be convicted under the indictment in this case, unless they have formed a military enterprise or expedition in the sense which I have stated.

"The defendants are entitled to the benefit of all reasonable doubt that may arise on the evidence or the circumstances of the case; and if such doubt exists upon the whole evidence, the defendants must be acquitted, and the verdict of the jury must be not guilty."

On the part of the government—

MR. MACFARLANE: In regard to those requests I am satisfied your Honor has covered them. I am satisfied with your charge in that respect; but if it is now time I will ask, instead of those re-

quests, in view of the way in which they have been drawn, that you will indicate to the jury that in considering the circumstances of evidence presented here they must not treat each one separately and consider whether each one alone, is sufficient to constitute the crime, but they must consider them all together, and their general result, as proving the various points which the government must make out. They must not each be taken out separately and consider whether that one alone is sufficient.

THE COURT:    You mean the evidence?

MR. MACFARLANE:    Yes, that is the theory upon which these requests are drawn.

THE COURT:    Yes.    Now gentlemen, the weight that you are to give to the testimony of the different witnesses in this case must depend upon your appreciation of their fairness and their apparent truthfulness.    Some comment has been made upon some supposed differences of statement.    They have not seemed to me to be very important.    They may seem important to you.    That is a matter for you to determine.    But one rule of law I will state to you, that if you find that either witness has deliberately told a falsehood, deliberately misstated a material circumstance, then you are entitled to disregard that witness' testimony altogether unless you find it corroborated by some facts or circumstances to satisfy you of its correctness.    You are the judges of the credit to be given to the witnesses; and in judging of it you will judge by their apparent manner, by their apparent candor, their apparent intelligence, their mode of testifying, under cross-examination as well as on direct examination, and the consideration of motives, if you find any motives, on the part of either of the witnesses to color the testimony or to give any impression different from the actual truth.    And in making up your minds as to what was the character of this expedition, and also as to what knowledge either of these defendants had about it, it is not one single circumstance alone in such cases that goes to make up the judgment, but it is all; and particularly in those matters which bear upon the question of knowledge and intention it is your duty to take into consideration all the circumstances and the whole sequence of events.    Parts of an enterprise which fit into each other do not come about by accident.    Opportunities and accidents may be availed of; but you are generally able to understand perfectly when a use is made of an accidental opportunity, and to distinguish between that and such a successive order of events as shows prearrangement and concert.    It is in that view that you will judge of this case as a whole.

I think that, gentlemen, is all that I need to say; cautioning you only at the last in regard to the performance of your duty, that you do not permit any sympathies to stand against the evidence in the case.    Several of you on the examination of jurors stated your sympathies in general with the Cuban insurgent cause.    It is the right of every individual; and in the case of a struggling community, our sympathies are naturally given to the weaker side, particularly if there seem to be considerations of justice or equity that favor it. We owe, however, our primary duty to our own country, and to the

enforcement of the laws upon which may depend our own peace, and upon which at all events does depend the honorable conduct of our national affairs. We owe it, both court and jurors, that we should give a true and fair enforcement to the statute; not to bend it one way or the other from what we conceive to be its true and actual intention. We are not to allow ourselves to be misled through personal sympathy with the Cuban cause, into supporting illegal acts which would do us as a nation discredit if they are illegal and wrong. On the other hand we should not allow ourselves to be pressed by the urgency of those who are opposed to the Cuban cause, into extending our law to cases which it was not designed to cover. We are to apply the law as impartially and truly as we are capable of construing it and applying it; and in that way to discharge our duty with credit to ourselves, and with satisfaction to our own consciences.

MR. RUBENS: I except to that portion of your Honor's charge in which you say Nunez appears to have had charge of the arms, and I ask your Honor to charge the jury that they are to decide that question, whether or not he did have charge of the arms.

THE COURT: Undoubtedly. If I have expressed any opinion at any point, on this evidence, it is to be taken with the knowledge that it is for you alone to determine all questions of fact. In the clause to which exception has been taken—I don't recall it at this moment, but I presume I had reference to the testimony as to what Nunez did in directing when the discharge of arms should stop, and what should be done with the remainder. You remember that evidence, and you will give it such consideration as you think it deserves, and place no weight upon any suggestion of mine in that regard.

The jury then retired.

MR. RUBENS: We except to the refusal of your Honor to charge each and every request as stated without modification.

MR. LEWIS: We take the same exception.

The jury were unable to agree.