[L. A. No. 3196. In Bank.—April 7, 1914.]

## J. C. MELLEN, Appellant, v. THE TIMES-MIRROR COMPANY (a Corporation), Respondent.

LIBEL AND SLANDER—CHARGING VIOLATION OF NEUTRALITY LAWS— TRANSPORTATION OF ARMS TO INSURRECTIONISTS IN ANOTHER COUNTRY.—The publication in a newspaper of an article charging a violation of the neutrality laws of the United States, in carrying arms and ammunition to and for the subjects of a foreign country in a state of insurrection against their own government, which country is at peace with this government, does not necessarily involve such elements as would impute to a person deemed guilty thereof anything infamous, ridiculous, disgraceful, or in the nature of moral

turpitude, except in so far as the commission of any act forbidden by law, however innocent and free from censure it might otherwise be, would produce such a result.

Id.—Publication Charging Filibustering—Delivery of Arms to Mexican Insurrectos.—A newspaper article, with the word filibustering in the heading, which at most charges a person with being concerned in an attempt to secretly carry by sea from San Francisco to some point on the Mexican coast a cargo of arms and ammunition for delivery to the "Mexican insurrectos," is not libelous.

Id.—Complaint in Action for Libel—Sufficiency to State Cause of Action—Question for Court.—It is for the court to determine whether, in the light of such extrinsic facts as are alleged to be libelous, the writing can be a libel; if, in the light of such extrinsic facts, the article is not fairly susceptible of the defamatory meaning sought to be attributed to it, the complaint fails to state a cause of action.

Id.—Interpretation of Language—Question for Jury.—But if the language of the article is capable of two meanings, one of which is harmless and the other libelous, and it is alleged that the same was used and understood as conveying the latter meaning, a cause of action is stated, and it is the province of the jury to determine in which sense the language was used and understood by the readers of the article.

Id.—Neutrality Law—Transportation of Arms and Ammunition.—It is not an offense against the neutrality law of the United States to transport arms, ammunition, and munitions of war from this country to any foreign country, whether they are to be there used in war or not.

Id.—Foreign Belligerent—Aid Through Commercial Dealings.—An expedition or enterprise designed only to transport munitions of war as merchandise for a foreign belligerent, though for use of an army, is not within the inhibition of section 5286 of the United States Revised Statutes.

APPEAL from a judgment of dismissal of the Superior Court of Los Angeles County.   J. P. Wood, Judge.

The facts are stated in the opinion of the court.

E. B. Drake, for Appellant.

Hunsaker & Britt, and W. N. Goodwin, for Respondent.

ANGELLOTTI, J.—This is an action for damages for an alleged libel on plaintiff published in *The Los Angeles Times,*

a daily morning newspaper published by defendant in the city of Los Angeles, and circulated in the the city and county of Los Angeles and other counties of California, and also in other states of the United States of America. The article complained of is set out in the complaint, and is as follows:

"Filibustering.

Suspect Vessel of
Taking Arms.
Steam Schooner Eureka off
Coast of Mexico.

---

Bound Ostensibly for Honduran Port, Government Suspects Cargo Consists of Munitions of War for the Insurrecto Forces—Angeleno's· Name Mixed in Affair.

---

(By Direct Wire to The *Times*.)

"San Francisco, May 20.—(Exclusive Dispatch.) Carrying arms and ammunition, presumably for the Mexican insurrectos, the little steam schooner 'Eureka' is trying to land her cargo somewhere along the Mexican coast. The 'Eureka' cleared from this port a week ago, ostensibly from Amapala, Honduras, and her cargo was supposed to consist of supplies for a mining company of which J. C. Mellen of Los Angeles is the head.

"However, government agents in this city have ascertained that the "Eureka's' cargo consisted of munitions of war, and a report to this effect has been forwarded to the state department.

"The government agents, however, are not absolutely certain that the arms and ammunition were destined for the Mexican insurrectos, although the evidence indicates that such is the fact.

"Mellen and others said the 'Eureka' was bound to the Honduran port and that she carried supplies for a mining company. However, it was noticed that no machinery nor tools commonly used in mines was aboard, and the further fact that crude oil is conveyed in iron tanks and not in barrels added further to the suspicion that attached to the vessel's movements.

"The 300 barrels supposed to have contained oil are believed to have contained ammunition, and the coal is believed to have covered cases of rifles."

It was alleged that by the language used defendant intended to charge and to be understood as charging that plaintiff was engaged in carrying on what is commonly known as a "filibustering expedition," and was a criminal by violating the neutrality laws of the United States in carrying arms and ammunition to and for the subjects of a foreign country, which was at peace with this government, but which subjects were in a state of insurrection against their own government; and further that the article was so understood by the readers of said paper. It was further alleged that the charge was false, scandalous, and unprivileged, that it exposed plaintiff to hatred, contempt, and ridicule, and that by reason thereof "plaintiff was . . . injured in his reputation and good name as a citizen, and said publication inflicted upon him grievous mental suffering, all to his damage in the sum of" fifty thousand dollars.

An answer having been filed, the case came on for trial, whereupon the trial court sustained an objection to further proceedings upon the ground that plaintiff's complaint did not state facts sufficient to constitute a cause of action. Plaintiff refusing to amend, judgment of dismissal was given. We have here an appeal from such judgment.

The only question presented is whether or not the published article was libelous in character.

Libel is defined by section 45 of the Civil Code as being "a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." There is no allegation or pretense that the article has a tendency to injure plaintiff "in his occupation." As is suggested by counsel for defendant, there is no allegation that he had any "occupation," and no claim for damage on that account.

Consideration of the alleged libelous article leads us to the conclusion that unless by fair inference and deduction the article may be taken as charging plaintiff with the commission of some act denounced as a crime by the United States, it is

not libelous in nature.  It is the duty of all good citizens of
the United States to refrain from the commission of any act
denounced as a crime by its laws, and a statement to the ef-
fect that one is willfully engaged in any such forbidden act
is calculated to expose him to more or less obloquy, depending
of course upon the nature of the crime.  A false charge that
one has committed *any* crime may therefore be conceded to be
libelous.  The particular crime here claimed to be charged,
viz., a violation of the neutrality laws of the United States,
in carrying arms and ammunition to and for the subjects of
a foreign country in a state of insurrection against their own
government, which country is at peace with this government,
does not necessarily involve such elements as would impute
to a person deemed guilty thereof anything infamous, ridicu-
lous, or disgraceful, or in the nature of moral turpitude, ex-
cept in so far as the commission of any act forbidden by law,
however innocent and free from censure it might otherwise
be, would produce such a result.  As was substantially said in
*Crashley* v. *Press Publishing Co.,* 179 N. Y. 34, [1 Ann. Cas.
196, 71 N. E. 258] to charge a person with being in sympathy
with a revolution in certain South American states, or abet-
ting it, would not seem to impute to him anything infamous
or disgraceful.  This would appear to be especially true for
some years now last past as to a revolution in Mexico, where
political uprisings of this character have been almost contin-
uous, and where the "insurrectos" of to-day constitute the
government of to-morrow.  There is absolutely nothing in the
published article, or in the complaint, to indicate that the
revolt then in progress in Mexico was not one based upon
good or sufficient cause, and animated by the highest and best
of motives.

Taking the whole article together, it charges plaintiff at
most with being concerned in an attempt to secretly carry by
sea from San Francisco to some point on the Mexican coast a
cargo of arms and ammunition for delivery to the "Mexican
insurrectos."  The word "filibustering" at the head of the
article, when read in connection with the remainder of the
article, cannot be read as conveying any other meaning.  No
facts are alleged upon which it can reasonably be claimed that
this charge imputed to plaintiff anything dishonorable or dis-
reputable, or anything that could expose him to hatred, con-

tempt, ridicule, or obloquy, or cause him to be shunned or avoided by any one, or that could cause him any injury, assuming always that no crime was charged. Of course, under the circumstances, there is nothing discreditable in the secrecy alleged to have been observed as to the nature of the cargo.

In view of the decisions, it seems clear that the acts attributed to plaintiff and his associates by the article in question, did not constitute a crime under any law of the United States. It is thoroughly settled that it is not an offense against the neutrality laws of the United States to transport arms, ammunition, and munitions of war from this country to any foreign country, whether they are to be there used in war or not. Section 5286 of the United States Revised Statutes, [Comp. Stats. 1901, p. 3601, 5 Fed. Stats. Ann., p. 366], prohibits simply any person, within the territory or jurisdiction of the United States, beginning or setting on foot, or providing or preparing the means for "any military expedition or enterprise to be carried on from thence" against another friendly power, and does not prohibit the mere engaging in transportation of arms or ammunition as a commercial venture, nor peaceable aid rendered to either belligerent, so long as this aid arises indirectly only through commercial dealings. An expedition or enterprise designed only to transport munitions of war as merchandise for a foreign belligerent, though for use of an army, is not within the inhibition. (See *Wiborg* v. *United States,* 163 U. S. 632, [41 L. Ed. 289, 16 Sup. Ct. Rep. 1127, 1197] ; note to sec. 5286 United States Revised Statutes, 5 Fed. Stats. Ann. p. 374; *United States* v. *O'Brien,* 75 Fed. 900. See, also, 2 Wharton on Criminal Law, sec. 1903.) The resolution of Congress authorizing the president to prohibit, in his discretion, the export of arms and munitions of war to a foreign country under certain conditions, was not adopted until after the publication of this article.

Not only do the matters stated in the published article of and concerning plaintiff fail to show any violation by him of the neutrality laws of the United States, but furthermore we are of the opinion that the article could not reasonably be understood as imputing that he was guilty of any crime by reason of his alleged connection with the matter. Certainly, it was not expressly charged that he had violated any law,

and we do not see that such a violation by him is even suggested by the article complained of. Of course, the allegation in the complaint that the article was in fact understood by its readers as charging and asserting that plaintiff was a criminal by violating the neutrality laws of the United States in carrying arms and ammunitions, etc., does not assist the plaintiff, unless the article was of such a nature that, in view of the extrinsic facts alleged in the complaint, such a conclusion was fairly deducible therefrom. As said in respondent's brief, "If the words before the innuendo do not sound in libel, no meaning produced by the innuendo will make them libelous, 'for it is not the nature of an innuendo to beget an action.' " (*Grand* v. *Dreyfus*, 122 Cal. 62, [54 Pac. 390].)

It cannot be disputed that it is for the court to determine whether, in the light of such extrinsic facts as are alleged, the writing can be a libel. If, in the light of such extrinsic facts, the article is not fairly susceptible of the defamatory meaning sought to be attributed to it, the complaint fails to state a cause of action. Of course, if the language of the article is capable of two meanings, one of which is harmless and the other libelous, and it is alleged that the same was used and understood as conveying the latter meaning, a cause of action is stated, and it is the province of the jury to determine in which sense the language was used and understood by the readers of the article. But it is for the judge to determine whether the language used is capable of the defamatory meaning claimed for it by the plaintiff. (See *Van Vactor* v. *Walkup*, 46 Cal. 124, 133.)

We are of the opinion that the lower court did not err in concluding that the article in question was not libelous in character.

The judgment is affirmed.

Melvin, J., Henshaw, J., and Lorigan, J., concurred.