[Civ. No. 7455. Second Appellate District, Division One.—July 22, 1932.]

MARY GREER CONKLIN, Appellant, v. HARVEY R. LING et al., Respondents.

Mary Greer Conklin, *in pro. per.,* for Appellant.

Ralph W. Swagler for Respondents.

CONREY, P. J.—The facts are stated in the dissenting opinion of Mr. Justice Houser. We are all in agreement that the court did not err in sustaining the demurrer to the plaintiff's complaint. ■ We of the majority, however, think that the alleged publication of which plaintiff complained was neither libelous on its face nor capable of being given a libelous quality by means of any amendment to the complaint. We therefore are of the opinion that the court very properly dismissed the action without first giving plaintiff permission to file an amended complaint.

■ There being no argument presented in support of the appeal from order denying motion to strike cost bill, that appeal is deemed to be without merit.

The judgment is affirmed. The order is affirmed.

York, J., concurred.

HOUSER, J., Dissenting. — From the complaint filed in the lower court in pertinent substance it appears that plaintiff, as an author, and the defendants, as publishers of a newspaper, theretofore had agreed one with the other that the defendants would publish as a serial in their newspaper a certain story which had been written by plaintiff and as to which, with the knowledge of the defendants, plaintiff was desirous of copyrighting both in the United States and in Great Britain; that (as alleged) "in order to secure a copyright in the United States an affidavit must accompany the application for copyright stating that the 'matter is printed from type set within the borders of the United States'; that in order to copyright the same material in Great Britain there must, under British law, be simultaneous filing for copyright in Washington, D. C., and in the British Museum in London, the British law allowing only fourteen days for transportation by mail as a divergence in dates of filing; that unless British copyright is secured simultaneously with the copyright in the United States the same matter could never later be copyrighted in Great Britain".

The complaint contains further allegations to the effect that, notwithstanding full knowledge possessed by the defendants of the foregoing facts, and without having theretofore caused the entire matter of the story written by plain-

tiff to be set in type as contemplated by the said copyright regulations, the defendants caused a "large display advertisement—announcement" to be inserted in a publication of their newspaper that the story "would begin in a few days"; that immediately thereafter plaintiff unsuccessfully endeavored to perfect arrangements with the defendants so that in order to have the said story copyrighted a compliance would be had with the required legal conditions precedent with reference to having the said story in type prior to the publication of any part or installment thereof; and upon failure and refusal of the defendants to co-operate with plaintiff to that end, "directed the newspaper not to publish any more announcements until they could arrange to set the type of the entire story and run off sheets which could be forwarded to the British Museum in London"; that thereupon, without and in the absence of any "misunderstanding" on the part of either of the parties regarding the situation, the defendants "maliciously published of and concerning the complainant the following false, defamatory and unfair professional libel: 'Due to a misunderstanding with the author, it will be impossible to start the new story "Enduring Love" advertised to start today, Monday, Feb. 18th.'"

Following an allegation contained in the complaint to the effect that the statements contained in said publication were false, etc., the allegation is made: "That the said professionally defamatory, false and unfair publication by innuendo said, and by innuendo meant to state, and was so taken by newspaper readers to mean, that the author, Mary Greer Conklin, the complainant, was irresponsible and did not keep her writing engagements; that the said professionally defamatory, false and unfair publication by innuendo said, and by innuendo meant to state, that the author, Mary Greer Conklin, the complainant herein, was not to be depended upon."

Although by several different subsequent allegations contained in the complaint plaintiff endeavored to set up facts from which *malice* of the defendants toward plaintiff might be found to have existed both before and after the alleged libel was published—neither in form nor in substance were any pertinent extrinsic facts, nor any inducement nor innu-

endo alleged other than such as those or that respectively to which attention hereinbefore has been directed.

The lower court sustained the defendants' demurrer to plaintiff's complaint "without leave to amend" the same, and thereupon rendered judgment against plaintiff and in favor of the defendants. It is from such judgment, as well as from an order made by said court by which plaintiff's motion to strike defendants' cost bill was denied, that the instant appeals are taken.

Although the point is neither suggested by the respondents, nor discussed in the prevailing opinion, in order that no merited criticism may be directed toward the appeal by reason thereof, it may be stated that, in view of the fact that the demurrer to the complaint was sustained "without leave to amend"—to enable plaintiff on appeal from the judgment not only to protest the sufficiency of the complaint, but as well to attack the validity of the order and the ensuing judgment by which her right to amend the complaint was denied, she was not required as a condition precedent to the assertion of such right to first make a motion for leave to amend the complaint and thereafter have such motion denied by the trial court. (*Schaake* v. *Eagle Automatic C. Co.,* 135 Cal. 472, 480 [63 Pac. 1025, 67 Pac. 759]; *Metzger* v. *Vestal,* 76 Cal. App. 409, 416 [244 Pac. 942].)

It is clear that leave to amend the complaint having once been denied by the trial court, it should be presumed that thereafter, had plaintiff presented her formal motion to amend her complaint, in substance an order identical with that formerly made by the trial court again would have been made. The law does not demand the performance of an idle act.

On consideration of the alleged libelous language it becomes manifest that, if actionable, it must be so because by its covert meaning, as was intended by its publisher and as was rightfully understood by the readers of the newspaper in which the words were published, some aspersion was cast upon the character of plaintiff which was harmful to her in the pursuit of her occupation.

It is obvious that in its ordinary significance and as commonly understood, no libelous meaning could attach to the language of which plaintiff complains; but it is contended by appellant that, as explained by the "extrinsic facts", or

the inducement, and the colloquium, the published words "due to a misunderstanding with the author", constituted a libel of plaintiff which had a tendency to injure her in her occupation. (Sec. 45, Civ. Code.) It therefore becomes apparent that, somewhat reduced in its expression, the question here presented is whether, by the allegations contained in the complaint, plaintiff set forth such facts that from them it should follow as a matter of law that a cause of action either was or might have been stated.

Preliminarily, it should be noted that "words which on their face appear to be entirely harmless, may, under certain circumstances, convey a covert meaning, wholly different from the ordinary and natural interpretation usually put upon them" (16 Cal. Jur. 39, and authorities there cited); and that if by proper pleading and competent evidence such hidden meaning be respectively averred and established, the plaintiff may become entitled to recover such a judgment for damages against the defendant as the evidence may show resulted to the plaintiff by reason of the publication of the alleged libel.

As apt illustrations of the application of such rule, see *Maynard* v. *Fireman's Fund Ins. Co.*, first reported in 34 Cal., at page 48 [91 Am. Dec. 672], and later in 47 Cal., at page 207, where the alleged libel consisted in the published statement that "this company, for good and sufficient reasons, has resolved to dismiss D. D. Maynard from its service". Likewise, in the case of *Ingraham* v. *Lyon*, 105 Cal. 254 [38 Pac. 892], in which it appears "that defendants were members of a Merchants' Protective and Collection Association, doing business in Oakland; that they caused to be entered upon the 'black list' of the association the following: 'When entered, February 13, 1892; name of delinquent debtor, George Ingraham; occupation, porter; residence, 718 Henry street; when account closed, month, January, day, 2nd, year, 1892, amount, $14.25, by whom reported, J. L. Lyon & Son'." See, also, *Grand* v. *Dreyfus*, 122 Cal. 58 [54 Pac. 389, 390], in which case the plaintiff complained of the words, "If he (plaintiff) continues to *sell* my hogs, I (defendant) will send him where he was another time, . . . "

As applied to an action for damages for a libel of the character of that here under consideration, it is a well-

recognized rule of pleading that in order to show the connection between what ordinarily would be understood as innocent and harmless words, and the sinister or injurious meaning, or the innuendo, which it is claimed was by the publisher thereof intended to be, and which in fact was, understood by the readers of such published words, the extrinsic circumstances, or what ordinarily is termed the inducement, must be set forth in the complaint. (16 Cal. Jur. 86 et seq., and authorities there cited.) But notwithstanding the existence of the rule that the utterance or the publication of apparently harmless words, when properly and sufficiently supported in the complaint by allegations of extrinsic facts, may be actionable, nevertheless it is equally well-settled law that the innuendo, or the declaration by the plaintiff in the action by which he ascribes the meaning which was intended by the defendant and the manner in which the libel or the slander was understood by the readers or the hearers thereof—can be no broader than is justified or warranted by the facts upon which such attributed meaning rests. (16 Cal. Jur. 88; *Bates* v. *Campbell*, 213 Cal. 438 [2 Pac. (2d) 383]; *Pollock* v. *Evening Herald Pub. Co.*, 28 Cal. App. 786 [154 Pac. 30], and authorities in such cases respectively cited.) In other words, the innuendo, like an allegation of fraud, is nothing more nor less than a pleading of an ultimate fact (or possibly a conclusion of law), which in order to be legally effective must be supported by extrinsic facts which have been pleaded in the complaint.

Adverting to the extrinsic facts or the inducement set forth in the complaint herein, and coupling it with the alleged innuendo therein contained, it appears that the gist of the charge is that, as between plaintiff and the defendants, although complete harmony existed in the minds of such respective parties relative to the requirements of copyright regulations, and incident thereto the necessity that the entire manuscript theretofore prepared by plaintiff should be actually in "type" prior to the publication of any part of it—the defendants falsely published the statement that because of a "misunderstanding" with the author, the story theretofore written by plaintiff could not be published; and by such statement intended to declare, and by the readers thereof was understood to mean, that plaintiff was "irre-

sponsible and did not keep her writing engagements; . . . was not to be depended upon''.

It will be noted that other than that in effect the defendants asserted that a ''misunderstanding'' existed between them and plaintiff regarding the publication of the story of which plaintiff was the author, the complaint contained no averment of extrinsic facts or inducement by or from which it might be reasoned and thereby legally concluded that by the use of the word ''misunderstanding'' the defendants had intended to assert, and the readers of their newspaper had understood the defendants as asserting, that plaintiff was ''irresponsible'', or that she could not ''be depended upon''. Exactly as is stated in the case of *Mellen* v. *Times-Mirror Co.*, 167 Cal. 587, 591 [Ann. Cas. 1915C, 766, 140 Pac. 277], in the inducement proper, ''no facts are alleged upon which it can reasonably be claimed that this charge imputed to plaintiff anything dishonorable or disreputable, or anything that could expose him to hatred, contempt, ridicule, or obloquy, or cause him to be shunned or avoided by anyone, or that could cause him any injury, . . . ''; or (as applied to the instant case), which could have a tendency to injure her in her occupation. (Sec. 45, Civ. Code.) Particularly does the inducement not contain any sufficient statement of facts by or from which it might or does even inferentially appear that by the use of the alleged libelous words any hidden or covert meaning of a sinister or harmful significance was either intended or expected to be conveyed, or was so understood by the readers of the published article.

In the case of *Mahana* v. *Echo Pub. Co.*, 181 Cal. 233, 237 [183 Pac. 800, 802], in commenting upon a situation similar to that here under consideration, the Supreme Court said:

''Unless the article was of such a nature that in view of extrinsic facts alleged and proved it conveyed to the readers of the newspaper charges of dishonesty or financial irresponsibility of plaintiffs, of course the innuendo will not give it that sinister significance. (*Mellen* v. *Times-Mirror Co.*, 167 Cal. 587 [Ann. Cas. 1915C, 766, 140 Pac. 277].)'' To the same effect, see *Chavez* v. *Times-Mirror Co.*, 185 Cal. 20, 25 [195 Pac. 666].

As stated in the prevailing opinion herein, the members of this court are in accord one with the other in the conclusion that, in view of the adjudicated cases by the Supreme Court

and the Court of Appeal of this state, the demurrer to the complaint was properly sustained. But my inability to completely agree with my associates arises from the order of the trial court by which plaintiff was denied the right to amend her complaint.

It must be apparent that if from the allegations contained in the complaint it appears that the defect in attempting to state a cause of action is as to form only, or that either the stated or the obviously omitted facts, or both of them combined, were such that had they been correctly and scientifically pleaded a cause of action might have been stated, it should follow that the denial to the plaintiff of the right to amend her complaint was prejudicial to her substantial rights in the premises. (21 Cal. Jur. 121, and authorities there cited.) In other words, unless it affirmatively appear that the complaint is incapable of amendment so as to state a cause of action, ordinarily leave should be granted to plaintiff to amend his complaint.

The theory upon which the trial court is empowered to deny to a plaintiff the right to amend his complaint rests upon the incontrovertible assumption that by no possible combination of the facts surrounding the transaction, or condition of which the plaintiff complains, may he state a cause of action. Manifestly the proper function and duty of the court is to administer equal and indiscriminative justice as between parties before it—not to deny justice to either or any of them. If on consideration of the complaint in an action, irrespective of either the allegations which it contains, or those which in reason might thereafter be inserted therein, under and in pursuance of the law of the land the trial court be authorized irremediably to sustain a demurrer thereto "without leave to amend", the perpetuation of an apparent arbitrary and autocratic power consistent only with the disposition, rights and liberties of man as exercised by an absolute monarchy would be threatened, if not be actually existent. Fortunately in this jurisdiction the invariable rule has been adopted that "it is error to sustain a general demurrer without leave to amend, unless it appears that the complaint is incapable of amendment in a radical particular". (21 Cal. Jur. 121, and authorities there cited.) Nor in an action for damages which arises from an alleged

libel should the rule differ in that particular from the rule which is applicable in any other action.

From a consideration of the nature of the action and the allegations of the complaint constituting the extrinsic circumstances or the inducement, to my mind it does not affirmatively appear that in no possible condition or circumstances might additional or substituted allegations not be made which, together with those now appearing in the complaint, might constitute a sufficient statement of a cause of action. It may be a fact that because of inadvertence, or of the lack of experience of plaintiff in matters of the character of that here under consideration, she has failed to appreciate the existence of certain relevant and material facts which, if properly pleaded, would at least aid in the proper and scientific preparation of her complaint. As an indication that in the inducement proper plaintiff did not exhaust her opportunities to lay a foundation either for the alleged innuendo which she claims was intended, or for some other innuendo which might be supported by the extrinsic facts, the later allegations of her complaint by which the *malice* of defendants was pleaded may be cited. Such allegations were as follows:

"That showing the malice of said professionally defamatory, false and unfair statements in said publication the complainant avers that the defendants Harvey R. Ling, one of the high officers of the Review Ptg. Co., and Mrs. Lillian Harris Greer, another of the high officers of the Review Ptg. Co., and Miss May Read, another high officer of the Burbank Review Pub. Co., have stated repeatedly that the complainant, Mary Greer Conklin, is crazy; that she is 'an educated fool' and a 'writing fool'; that nobody could get along with her; that the said Harvey R. Ling laughed sardonically when he discussed the tactics he quietly pursued with regard to publishing the story 'Enduring Love' and how with glee he noticed that those tactics worried the complainant; that he stated months later apropos of publishing a want advertisement the complainant had prepared for another member of the family that he would not publish said advertisement because the complainant had written it—not if anybody paid him a million dollars for so doing; that by other and divers ways he has shown malice not only toward the

complainant but toward other immediate members of her (the Greer) family as well. . . .

"That showing further the malice of said false, professionally defamatory and unfair publication complainant avers that the said Harvey R. Ling and the Review Ptg. Co. through others of its high officers intended to state (coupling their own repeated verbal statements that the complainant was 'crazy' with the professionally defamatory, false and unfair publication) and by innuendo did state that the author and complainant was crazy and therefore resorted to ruses ('misunderstandings') in her professional writing engagements; that the readers who had heard these verbal accusations that the author (because of certain sociological work she had done in Burbank) was 'crazy' so took the publication to mean by innuendo that the author and complainant had thus given another example of her 'craziness'."

In the case of *Grand* v. *Dreyfus,* 122 Cal. 58, 63 [54 Pac. 389, 391], it is said: "It is not material *where* the matters of inducement appear in the complaint—whether *before* or *after* the statement of the language published, although logically they should precede the words spoken."

In the same case, on page 63, relative to the allegation of extrinsic facts, the following language appears: " . . . We cannot regard this (a specified allegation) as in any sense explaining the situation of and circumstances surrounding the parties, or as explaining what the defendant meant by saying, 'if he continues to sell my hogs'. It is alleged that the hearers understood defendant to mean 'steal my hogs', but does the complaint disclose enough extrinsic facts from which alone to warrant us in holding that the hearers had a right to put such construction on the language used, and that as matter of law his language had such meaning? We think not. It certainly cannot be the law that a defendant must answer to the charge of slander whenever, without reason, some bystander attributes to his language a meaning wholly different from the natural import of the language used. There should be sufficient inducement alleged somewhere in the complaint from which, when proven to be true, it would be fair and reasonable to say as matter of law that defendant intended in using the language to charge that the plaintiff was guilty of the crime, or the act giving rise to the alleged slander."

However, neither in the case of *Maynard* v. *Fireman's Fund Ins. Co.*, 34 Cal. 48, 47 Cal. 207, nor in *Ingraham* v. *Lyon*, 105 Cal. 254 [38 Pac. 892], is it in anywise suggested that in framing a complaint and in alleging extrinsic facts or inducement the plaintiff must go to anything like the length suggested in the case to which reference has just been had.

But even relying exclusively upon the principle announced in the case of *Grand* v. *Dreyfus*, 122 Cal. 58 [54 Pac. 389], it would seem clear that if by proper foundational allegations of extrinsic facts and circumstances in the complaint it should appear that by the publication by the defendants of a statement that "due to a misunderstanding with the author", etc., the defendants falsely, and without any exemption of privilege, meant to charge, and that the readers of the newspaper published by the defendants "had a right to put such construction on the language used", and in fact understood the defendants to mean, that plaintiff was "crazy"; that she was "an educated fool; . . . a writing fool; . . . resorted to ruses ('misunderstandings') in her professional writing engagements"; and had "thus given another example of her craziness",—in substance, if not in form, the complaint contained required basic elements for the statement of a cause of action. (*Maynard* v. *Fireman's Fund Ins. Co., supra; Ingraham* v. *Lyon, supra.*) Of course, it may be that, as apparently is required by the respective rulings to which attention has been directed, plaintiff would not have been successful in any attempt which she might have made to establish a proper and sufficient connection between the word "misunderstanding" and either of the several or the combined epithets or characterizations which, as alleged, the defendants expressed regarding plaintiff, her mentality, or her business habits, and consequently could not have laid a sufficient foundation for her conclusion as to what she alleged was intended by the defendants by their said publication, or as to how the language so employed by the defendants was rightfully understood by the readers of the newspaper; but to my mind, considering the existing conditions, at least an opportunity should have been afforded plaintiff to so amend her complaint as to comply, if possible, with the legal requirements of the situation.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 15, 1932, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 19, 1932.