37 So.2d 118

**SMITH et al. v. DOSS.**

**6 Div. 685.**

Supreme Court of Alabama.

Oct. 7, 1948.

Jack H. McGuire, of Tuscaloosa, for appellants.

Frank Bruce, of Tuscaloosa, for appellee.

STAKELY, Justice.

This is a suit brought by Roberta Lindgren Smith and Katrina Lindgren Mathews against James R. Doss, doing business as Radio Station WJRD. The suit seeks to recover damages for the alleged invasion of the plaintiffs' right of privacy. The complaint consists of one count to which demurrers were sustained. On account of this adverse ruling the plaintiffs took a nonsuit. Hence this appeal.

Two questions are presented for decision. (1) May an action be maintained in the State of Alabama for a violation of what has been termed the right of privacy? (2) If so, can the suit be maintained under the facts alleged in this case?

The allegations of the complaint may be summarized in substance as follows.

In 1946 James R. Doss, doing business as Radio Station WJRD at Tuscaloosa, Alabama, broadcast a commercial program designated as "Tuscaloosa Town Talks". This program was broadcast weekly over a period of several months. There was much public interest in the program. It had a large listening audience in the City and County of Tuscaloosa as well as on the part of others who could tune in on the broadcast. In May 1946 on several broadcasts of this program there was what purported to be a "sketch, description and practical history of the private and family life of plaintiffs, plaintiffs' father and plaintiffs' family, in which the name, actions and intimate details of the past and forgotten life of plaintiffs' father and of plaintiffs' family are reproduced, resurrected and detailed by graphic descriptions, creating a pen portrait of plaintiffs' father, his past and forgotten life, all recognizable to plaintiffs and to friends and acquaintances of plaintiffs and which clearly identified plaintiffs in the public mind", with the result that "plaintiffs have been subjected to contempt, ridicule and inquisitive notice of the general public to the injury of their name, personality, pride and honor and to the outrage of the finer sentiments of their nature and to the humiliation of their self-respect * * *, their privacy has been invaded and their right to privacy violated * * * and plaintiffs each have been caused and have suffered great mental pain and personal injury and degradation," the broadcast referred to being substantially as follows.

"Tuscaloosa Town Talks

"Many years ago, there lived in Tuscaloosa a man named John Lindgren, Swedish by nationality. Mr. Lindgren owned a blacksmith shop in Tuscaloosa and was prosperous and happy. He had a wife and two young children, Roberta and Katrina Lindgren. One day he told his family he was going to Birmingham to purchase stock for his blacksmith shop. He drove a pair of mules to an old-fashioned surrey —it was long before the days of the automobile. Mr. Lindgren's bank account was $700.00, in those days a nice savings for a man of his age with his own home and

family. He withdrew the entire amount and went on his way.

"In those days, there was a land bridge across the river between Tuscaloosa and Northport. Late in the night a shot was fired in the vicinity of the bridge. For some unknown reason John Lindgren in his surrey drawn by mules was crossing the bridge and apparently he had been murdered. Motive? $700.00. The shot had penetrated the cab of the surrey and Mr. Lindgren's coat was found and the shot had also penetrated it. His billfold was found nearby. The mules were stopped and early the next morning, knowing nothing of what had happened, nor to whom the mules belonged, John Sobrey brought them to Tuscaloosa to find the owner. As he approached the bridge, he had much difficulty for the animals, apparently remembering their original experience of the night before, did not want to cross the bridge.

"Hearing of the things that had happened, Sobrey returned the mules and went his way. That night while at home with his family, having their evening meal, officers came and broke into the merriment, informing Sobrey that he was being arrested and was going to jail for the murder of John Lindgren, a man he had never seen nor would he ever see. It was a long time before he dined with his wife and children again, for he spent many months in jail and was finally tried for the murder of John Lindgren.

"Not enough evidence of the proper kind was brought before the Court to convict him—a sentence was not given, but he was questioned and cross-questioned and finally released, but the public still believed that he had murdered John Lindgren. He informed the Court that time and God would clear him of that which he had been falsely accused. During all these months the river was dragged and redragged and every inch for miles around was searched for the body of the missing man.

"There lived with the Lindgren family in Tuscaloosa one brother of the missing man. He remained in Tuscaloosa for some time aiding in the search for his brother. For a long time the search went on in vain and was finally abandoned. Solution? Murder? Motive? $700.00. But where was the body? The brother finally returned to his native land and so far as is known was never heard of again.

"Many years passed—twenty-five—and finally one day in 1930 the body of John Lindgren arrived in Tuscaloosa. He had died in California of the dread disease of cancer. Time—and a long time it was—did prove that John Sobrey had been falsely and unjustly accused of the murder of John Lindgren, a man who had spent five months in jail for the murder of a man he never saw and who was not murdered. John Lindgren had lived the twenty-five years from the time of his disappearance in 1905, in California, not once communicating with his family or friends. He had accumulated substantial property and other interests in California. He left a will in which his daughter, Roberta Lindgren, was named the principal beneficiary. It was by means of this will that the California authorities found that he had a family in Tuscaloosa, Alabama, where his body finally came to rest in 1930."

Upon careful consideration we are satisfied that the right of privacy is supported by logic and the weight of authority. The decisions of the various courts and a number of law magazine articles on the subject are cited and summarized in exhaustive and analytical notes in 138 A.L.R. 22 and 168 A.L.R. 446. See also 41 Am. Jur. p. 927. It is shown that the doctrine was first formulated in an article written in 1890 by Samuel D. Warren and Louis D. Brandeis—later Mr. Justice Brandeis—entitled "The Right of Privacy". 4 Harvard Law Rev. 193; 41 Am.Jur. p. 926. A substantial portion of this article is set forth in an opinion of the Supreme Court of Florida in the case of Cason v. Baskin et al., in which many authorities are collected. Cason v. Baskin et al., 155 Fla. 198, 20 So.2d 243, 168 A.L.R. 430.

The general nature of the right of privacy is described in 41 Am.Jur. p. 925. It has been defined "as the right of a person to be free from unwarranted publicity" or "the unwarranted appropriation or exploitation of one's personality,

the publicizing of one's private affairs, with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." 41 Am.Jur. p. 925; 54 C.J. p. 816. Its violation is a tort. And while its violation often assumes a form similar to libel, there are differences. For example "in actions for infringement of the right of privacy, truth is not a defense and it is never necessary to allege or prove special damages." 41 Am.Jur. p. 925; 138 A.L.R. pages 47, 48; 168 A.L.R. page 452. See Lambert v. Jefferson, Ala.Sup., 36 So.2d 594,[1] for a discussion of general and special damages. The right of privacy is recognized in the American Law Institute's Restatement of Torts, Vol. 4, p. 398, § 867. Dean Pound wrote in 1915 in 28 Har.Law Rev. 362 "Unwanted and unsolicited publicity with respect to private matters of purely personal concern is an injury to personality. It impairs the mental peace and comfort of the individual and may produce suffering much more acute than that produced by a merely bodily injury. A man's feelings are as much a part of his personality as his limbs."

■ But there is a conflicting principle in that the "white light of publicity safeguards the public" and "free disclosure of truth is the best protection against tyranny." "Frequently the public has an interest in an individual which transcends his right to be let alone" and "since the whole is greater than its component parts, private rights must often yield to public interest." Michigan Law Review, Vol. 39, p. 526. Freedom of speech in broadcasting like freedom of the press, among other things, is to preserve untrammeled a vital source of public information. Barber v. Time, Inc., 348 Mo. 1199, 159 S.W. 2d 291; Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660. In other words the right of privacy does not prohibit the broadcast of matter which is of legitimate public or general interest. 138 A.L.R. page 49; 168 A.L.R. page 453. See also 41 Am.Jur. p. 935. As was said in Reed v. Real Detective Publishing Co., 63 Ariz. 294, 162 P.2d 133, 138, cited in 168 A.L.R. page 453, supra, in discussing the right of privacy, "It does not exist * * * where the plaintiff has become a public character, and thereby waived his right to privacy, nor in the ordinary dissemination of news and events, nor in connection with the life of a person in whom the public has a rightful interest, nor where the information would be of public benefit." Accordingly it is the duty and business of the courts in each particular case to find some point where these two conflicting principles may be reconciled, where the wonders of modern civilization which speed information and intelligence may be utilized and yet where the ordinary sensibilities of the individual may be protected from vulgar attention and the advance of selfish commercial interests.

■ In the case at bar however much we may sympathize with the feelings of the plaintiffs, we consider that the broadcast was the subject of legitimate public interest. By his own acts John Lindgren made himself a public character. The passage of time could not give privacy to his acts because the story of John Lindgren is a part of the history of the community. It is embedded in the public record through the imprisonment of John Sobrey on a charge of murder and his fight in the courthouse to prove his innocence and to free himself from the stigma of that charge. The will of John Lindgren is a public record. The broadcast was based on fact. We see no reason why the right of privacy of daughters might not be violated by unwarranted and offensive publicity with reference to their deceased father, but conclude for the reasons given that the allegations in this case do not state a cause of action. 41 Am. Jur. p. 936.

In view of the conclusions reached it is not necessary to consider other points in the case.

Affirmed.

BROWN, FOSTER and LAWSON, JJ., concur.

---

[1] Ante, p. 5.