[Civ. No. 24813.   Second Dist., Div. Three.   June 15, 1961.]

ERWIN P. WERNER, Appellant, v. TIMES-MIRROR
COMPANY (a Corporation), Respondent.

Charles Murstein for Appellant.

Cosgrove, Cramer, Diether & Rindge for Respondent.

FORD, J.—The plaintiff has appealed from a judgment of dismissal entered pursuant to section 581, subdivision 3, of the Code of Civil Procedure upon his failure to file a second amended complaint within the time allowed by the court after a general demurrer to his first amended complaint had been sustained.

The cause of action pleaded is predicated upon the theory that there had been an invasion of the plaintiff's right of privacy. Upon the hearing of a motion to dismiss the action because no bond had been filed as required in an action for libel under the provisions of section 830 of the Code of Civil Procedure, the plaintiff represented to the court that he was not seeking to maintain an action for libel; the motion was denied. The present case arose out of the publication in the Los Angeles Times on December 19, 1958, of an article which is set forth in the margin of this opinion.[1]

The allegations of the amended complaint are in substance

---

[1] "FORMER CITY ATTY. WERNER TO WED AGAIN"

"Former City Atty. Erwin P. (Pete) Werner, 65, a political storm center during the Mayor Shaw era of the 1930s, confirmed yesterday that he will be married for the third time sometime next year.

"The bride-to-be is Marjorie Augusta Coburn, 46, of Glendale, Grand Royal Matron of the Order of Amaranth, a State Masonic Order.

"The couple obtained a marriage license at Santa Ana Wednesday.

"Werner's first wife, Helen, won the sobriquet of Queen Helen in the Roaring 20s for her domination of Los Angeles politics.

"She was regarded as the mastermind of Werner's rise to political prominence and managed his campaign for City Attorney after their marriage.

"The Werners were rocked by a municipal scandal in the late 1930s involving alleged bribery in connection with Los Angeles liquor licensing. Werner was vindicated after more than four years of litigation, but his wife served a 10-month sentence for grand theft. She died in 1947.

"Werner ultimately was disbarred. He was reinstated four years ago after the State Supreme Court decided Werner had been rehabilitated and had regained the moral character necessary to practice law."

as follows: 1. The plaintiff was, and now is, a duly licensed attorney at law; he is also known by his nickname, to wit, "Pete Werner"; from 1929 to 1933 he was the duly elected, qualified and acting city attorney of the city of Los Angeles. 2. The defendant was, and now is, the owner and publisher of the Los Angeles Times, a daily newspaper of large and general circulation. 3. On or about December 17, 1958, the plaintiff and his fiancée applied to the County Clerk of Orange County for a marriage license; on or about December 18, 1958, the defendant requested information from the plaintiff concerning his intended marriage; the plaintiff refused to give such information and explained that his fiancée was a Grand Royal Matron of the Order of the Amaranth of the State of California and desired their plans to remain secret until she set a date for the marriage; contrary to such request, the article concerning his application for the marriage license was published (being the article set forth in footnote 1 of this opinion). 4. Such publication of former events in his life caused him "deep humiliation, emotional distress, anxiety and embarrassment among plaintiff's many friends and acquaintances, as well as members of the Bench and Bar and various fraternal organizations to which plaintiff belongs, all to his damage in the amount of $400,000.00." 5. The article was untrue in that it stated that the plaintiff was a political storm center during the Mayor Shaw era "of the 1930s," whereas in fact he was not an official of the city of Los Angeles during the administration of Mayor Shaw and was not involved in any of the scandals or "in any political storm center" during that administration; such statement "was intended to convey and did convey to the readers of the Los Angeles Times, that plaintiff was involved in and was a part of scandals concerning the regime or administration of Mayor Frank Shaw." 6. The article was untrue in stating that the plaintiff's first wife "won the sobriquet of Queen Helen, in the roaring 20s for her domination of Los Angeles politics, inasmuch as any such sobriquet, if any, is one which existed only as it was used by the defendant, and was used by the defendant solely for the purpose of humiliating and embarrassing plaintiff" and of "bringing derision" toward him. 7. The defendant used the word "mastermind" in the article, with respect to the part of plaintiff's first wife in the plaintiff's rise to political prominence, "for the purpose of conveying to its readers, and it did convey to its readers a derogatory meaning and was published for the purpose of further embarrassing and humiliating plain-

tiff.'' 8. The article stated that the plaintiff's first wife managed his campaign for the office of city attorney after their marriage, which was untrue; she never managed such campaign. 9. The article contained the statement that: ''The Werners were rocked by a municipal scandal in the late 1930s involving alleged bribery in connection with Los Angeles Liquor licensing''; that statement was untrue ''in that plaintiff was not an official of the City of Los Angeles, and the alleged bribery in connection with Los Angeles liquor licensing [sic], both plaintiff and his wife were acquitted of any such charges''; the statement ''was intended to convey and did convey to the readers ... that plaintiff was involved in and was a part of a municipal scandal.'' 10. The article was further untrue in that it stated that ''Werner was vindicated after four years of litigation,'' whereas in fact the plaintiff and his wife, Helen, were ''found not guilty of the said liquor licensing charge, by a verdict of not guilty by a jury approximately six months after the charges'' were filed. 11. The article ''unfairly, improperly and incorrectly stated that Helen Werner was convicted of grand theft and spent 10 months in jail, without publishing the fact that said Helen Werner was vindicated and that the verdict of guilty was set aside by motion of the District Attorney of Los Angeles County, California,'' as shown by the exhibit attached;[2] such publication was for the purpose of humiliating and embarrassing the plaintiff. 12. ''The said story was printed and published by the defendant willfully and maliciously, and by reason thereof plaintiff requests the allowance of exemplary damages. . . .''

The question presented on this appeal is whether a cause of action has been stated; in the determination of that matter the allegations of the appellant's complaint must be taken as being true. (*Gill v. Curtis Publishing Co.*, 38 Cal.2d 273, 275 [239 P.2d 630].)

This court said in *Fairfield* v. *American Photocopy Equipment Co.*, 138 Cal.App.2d 82, at pages 86-87 [291 P.2d

[2]The exhibit is a copy of the minutes of November 12, 1940, of department 41 of the Superior Court in the case of *People* v. *Erwin P. Werner* and *Helen M. Werner*. Part of the body thereof is as follows: ''On motion of the District Attorney, cause as to Defendant P. Werner [sic] is dismissed because of the ruling of the California Supreme Court. IT IS ORDERED that probation as to Defendant Helen M. Werner be terminated and said defendant discharged therefrom under Section 1203.3 Penal Code, that verdict of 'Guilty' be set aside and that cause as to said defendant be dismissed under Section 1203.4 Penal Code. Case is dismissed under Section 1385 Penal Code because of the reversal on appeal of the case of Defendant Erwin P. Werner.''

194]: "The gist of the cause of action in a privacy case is not injury to the character or reputation, but a direct wrong of a personal character resulting in injury to the feelings without regard to any effect which the publication may have on the property, business, pecuniary interest, or the standing of the individual in the community. [Citations.] ██ The right of privacy concerns one's own peace of mind, while the right of freedom from defamation concerns primarily one's reputation. [Citations.] ██ The injury is mental and subjective. It impairs the mental peace and comfort of the person and may cause suffering much more acute than that caused by a bodily injury." (See also *Gill* v. *Curtis Publishing Co., supra,* 38 Cal.2d 273, 276; *Kelly* v. *Johnson Publishing Co.,* 160 Cal.App.2d 718, 721 [325 P.2d 659].) ██ The right of privacy is a purely personal one. It cannot be asserted by anyone other than the particular person whose privacy is invaded. (*James* v. *Screen Gems, Inc.,* 174 Cal. App.2d 650, 653 [344 P.2d 799]; *Kelly* v. *Johnson Publishing Co., supra,* 160 Cal.App.2d 718, 721; *Metter* v. *Los Angeles Examiner,* 35 Cal.App.2d 304, 310 [95 P.2d 491].)

██ While ordinarily protection against the invasion of privacy is directed toward the prevention of unwarranted publication of intimate details of one's private life (*Coverstone* v. *Davies,* 38 Cal.2d 315, 322-323 [239 P.2d 876]), some matters are newsworthy events of such public or general interest that the press is privileged to report them as news. The issuance of a marriage license is such an event even though the parties involved may desire to keep information thereof from the public. (See *Aquino* v. *Bulletin Co.,* 190 Pa. Super. 528 [154 A.2d 422, 427].) ██ Guidance in ascertaining the limits of privacy is found in *Gill* v. *Hearst Publishing Co.,* 40 Cal.2d 224 [253 P.2d 441], wherein the Supreme Court said, at page 228: "The right 'to be let alone' and to be protected from undesired publicity is not absolute but must be balanced against the public interest in the dissemination of news and information consistent with the democratic processes under the constitutional guaranties of freedom of speech and of the press. [Citations.] ██ The right of privacy may not be extended to prohibit *any* publication of matter which may be of public or general interest, but rather the 'general object in view is to protect the privacy of private life, and to whatever degree and in whatever connection a man's life has ceased to be private, before the publication under consideration has been made, to that extent

the protection is to be withdrawn.' [Citations.] ■■■ Moreover, the right of privacy is determined by the norm of the ordinary man; that is to say, the alleged objectionable publication must appear offensive in the light of 'ordinary sensibilities.' "

■■■ A person may, by his own activities or by the force of circumstances, become a public personage and thereby relinquish a part of his right of privacy to the extent that the public has a legitimate interest in his doings, affairs, or character. (*Smith* v. *National Broadcasting Co.*, 138 Cal.App.2d 807, 812 [292 P.2d 600]; *Cohen* v. *Marx*, 94 Cal.App.2d 704, 705 [211 P.2d 320]; *Sidis* v. *F-R Pub. Corp.*, 113 F.2d 806-809 [138 A.L.R. 15].) ■■■ Since there can be no privacy with respect to a matter which is already public, ordinarily matters embodied in public records are not within the scope of protection. As said in *Melvin* v. *Reid*, 112 Cal.App. 285, at pages 290-291 [297 P. 91]: "The very fact that they were contained in a public record is sufficient to negative the idea that their publication was a violation of a right of privacy. When the incidents of a life are so public as to be spread upon a public record they come within the knowledge and into the possession of the public and cease to be private." (See also *Smith* v. *National Broadcasting Co.*, *supra*, 138 Cal.App.2d 807, 811-812.)

But even though a newspaper article may refer to a person who has at some time gained the status of a public personage, a difficult problem is the effect of the lapse of time upon the right to publish matters which, when they were current, were clearly of legitimate interest to the public. In *Cohen* v. *Marx*, *supra*, 94 Cal.App.2d 704, a statement made in 1949 reflecting upon the plaintiff's ability as a boxer was claimed to be an invasion of his right of privacy. The plaintiff alleged that about 1939 he abandoned his public career as a professional boxer, an occupation which he had undertaken in 1933. In holding that the demurrer to the complaint had been properly sustained, the court said, at page 705: "As to such acts he had waived his right of privacy and he could not at some subsequent period rescind his waiver." (See also *Leverton* v. *Curtis Pub. Co.*, 192 F.2d 974, 977; *Estill* v. *Hearst Publishing Co.*, 186 F.2d 1017, 1022; *Bernstein* v. *National Broadcasting Co.*, 129 F.Supp. 817, 828, 835; *Samuel* v. *Curtis Pub. Co.*, 122 F.Supp. 327; *Smith* v. *Doss*, 251 Ala. 250 [37 So.2d 118, 121]; Prosser, Torts, § 97, p. 644.) In the course of his recent

discussion of the subject, Prosser states, in part: "There can be no doubt that one quite legitimate function of the press is that of educating or reminding the public as to past history, and that the recall of former public figures, the revival of past events that once were news, can properly be a matter of present public interest. . . . Such decisions indicate that once a man has become a public figure, or news, he remains a matter of legitimate recall to the public mind to the end of his days." (Prosser, *Privacy*, 48 Cal.L.Rev. 383, at p. 418.)

While the case of *Smith* v. *National Broadcasting Co., supra*, 138 Cal.App.2d 807, related factually to a lapse of time of only three months, the sound view of the law applicable to lapses of time such as are involved in the pleading in the present case is clearly stated at page 814 of the opinion as follows: "It is characteristic of every era, no less than of our contemporary world, that events which have caught the popular imagination or incidents which have aroused the public interest, have been frequently revivified long after their occurrence in the literature, journalism, or other media of communication of a later day. These events, being embedded in the communal history, are proper material for such recounting. It is well established, therefore, that the mere passage of time does not preclude the publication of such incidents from the life of one formerly in the public eye which are already public property. [Citations.]"

When the article of which the appellant complains is viewed in the light of the governing law, it is obvious that the respondent invaded no privacy of the appellant in publishing the fact that a marriage license had been obtained and in making known the identity of the bride to be. Moreover, setting to one side for the moment the claims of inaccuracies and malice which will be hereinafter discussed, it is clear that the other portions of the article were as to matters which were in the public domain and, insofar as they concerned the appellant personally, related to a person who previously had acquired the status of a public personage. If no personal right of his was violated, he could acquire no cause of action because of any statement concerning his deceased former wife.

The allegations of the amended complaint that certain portions of the published article are untrue or misleading have been summarized at an earlier point in this opinion. It is to be noted that not all of the alleged inaccuracies are of a nature which can be said to be objectionable or to reflect

upon the appellant in such a manner as reasonably to cause offense to him. An example of an alleged falsehood which is clearly of a neutral nature is the statement that his first wife managed his campaign for the office of city attorney; such statement embodies nothing of a private nature and, even if false, cannot be said to be offensive in the light of ordinary sensibilities. (*Cf. Koussevitzky* v. *Allen, Towne & Heath, Inc.,* 188 Misc. 479 [68 N.Y.S.2d 779, 784], aff'd 272 App. Div. 759 [69 N.Y.S.2d 432] ; *Jones* v. *Herald Post Co.,* 230 Ky. 227 [18 S.W.2d 972].) But, proceeding upon the assumption that the article contains false and misleading assertions with respect to the plaintiff of such a nature as to cause him "deep humiliation, emotional distress, anxiety and embarrassment," as he alleges, the difficult question is whether a cause of action for invasion of his privacy arises therefrom. It is to be noted that the appellant does not allege that he has suffered special damages but confines his claim to one for general damages for the disturbance of his peace of mind.

The problem thus presented does not involve the common situation wherein the law insulates a person's private life against the publication of facts which, *even if true,* are of no legitimate concern to the public. (See *Coverstone* v. *Davies, supra,* 38 Cal.2d 315, 322-323; Prosser, Torts, § 97, p. 638.) The question may be stated as being whether a person who has theretofore acquired the status of a public personage may claim an invasion of his right of privacy when a newspaper publishes an article about him, the subject matter of which is within the general scope of what is understood to be within the public domain, if such article contains false or misleading statements which cause him emotional distress but no special damages. In resolving that question, no attention need be given to the pleading of malice for, as stated by Judge Clark in *Sidis* v. *F-R Pub. Corp., supra,* 113 F.2d 806, at pages 809-810: "If plaintiff's right of privacy was not invaded by the article, the existence of actual malice in its publication would not change that result."

Prosser has classified as a form of the tort of invasion of privacy a publication which puts "the plaintiff in a false but not necessarily defamatory position in the public eye."[3]

[3]In *Garner* v. *Triangle Publications, Inc.,* 97 F.Supp. 546, Judge Irving R. Kaufman said, at page 549: ". . . the right to invade a person's privacy to disseminate public information does not extend to a fictional or novelized representation of a person, no matter how public a figure he or she may be. [Citations.] When one assumes to determine what con-

(Prosser, Torts, § 97, p. 638; *cf. Gill* v. *Curtis Publishing Co., supra*, 38 Cal.2d 273; *Kerby* v. *Hal Roach Studios*, 53 Cal. App.2d 207 [127 P.2d 577].) Of the nature of that tort, Prosser has more recently said: "The false light cases obviously differ from those of intrusion, or disclosure of private facts. The interest protected is clearly that of reputation, with the same overtones of mental distress as in defamation. There is a resemblance to disclosure, but the two differ in that one involves truth and the other lies, one private or secret facts and the other invention. Both require publicity. There has been a good deal of overlapping of defamation in the false light cases, and apparently either action, or both, will very often lie. The privacy cases do go considerably beyond the narrow limits of defamation, and no doubt have succeeded in affording a needed remedy in a good many instances not covered by the other tort." (Prosser, *Privacy*, 48 Cal.L.Rev. 383, at p. 400.) But as to that developing concept, at page 401 of the same article, Prosser's language suggests caution: "It is here, however, that one disposed to alarm might express the greatest concern over where privacy may be going. The question may well be raised, and apparently still is unanswered, whether this branch of the tort is not capable of swallowing up and engulfing the whole law of public defamation; and whether there is any false libel printed, for example, in a newspaper, which cannot be redressed upon the alternative ground."

It is, of course, true that the tort of invasion of the right of privacy accords protection to a fundamentally different interest than that safeguarded by the law of defamation. But each of such interests conceivably could be invaded by the same publication in a particular case. (See *Kerby* v. *Hal Roach Studios, supra*, 53 Cal.App.2d 207, 213; *Garner* v. *Triangle Publications, Inc., supra*, 97 F.Supp. 546, 550; *Spiegel, Public Celebrity* v. *Scandal Magazine—The Celebrity's Right to Privacy*, 30 So. Cal. L.Rev. 280, 292.) However, while the appellant in the present case has disclaimed any reliance on the law of libel, it is clear that he could not, in any event, recover under the theory of the tort of libel in

stitutes legitimate factual news, and what constitutes fictionalization, it is undoubtedly true that there may be a wide and marked diversity of opinion as to what should be so designated. [Citation.] The Court cannot say that defendants' articles are as a matter of law in the area of legitimate news reporting in the face of plaintiffs' assertions that they are fictionalized." (See also *Aquino* v. *Bulletin Co., supra*, 190 Pa. Super. 528 [154 A.2d 422, 429-430].)

the absence of a demand for a retraction and a failure to comply therewith (Civ. Code, § 48a)[4] unless he could establish special damages. (*Jefferson* v. *Chronicle Publishing Co.*, 108 Cal.App.2d 538, 539 [238 P.2d 1018, 241 P.2d 20].) Yet, assuming some of the statements of which the appellant complains in his amended complaint to be libelous in nature,[5] to permit him to recover general damages in this case under the

[4]Section 48a of the Civil Code is as follows:

"1. In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve upon the publisher, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous.

"2. If a correction be demanded within said period and be not published or broadcast in substantially as conspicuous a manner in said newspaper or on said broadcasting station as were the statements claimed to be libelous, in a regular issue thereof published or broadcast within three weeks after such service, plaintiff, if he pleads and proves such notice, demand and failure to correct, and if his cause of action be maintained, may recover general, special and exemplary damages; provided that no exemplary damages may be recovered unless the plaintiff shall prove that defendant made the publication or broadcast with actual malice and then only in the discretion of the court or jury, and actual malice shall not be inferred or presumed from the publication or broadcast.

"3. A correction published or broadcast in substantially as conspicuous a manner in said newspaper or on said broadcasting station as the statements claimed in the complaint to be libelous, prior to receipt of a demand therefor, shall be of the same force and effect as though such correction had been published or broadcast within three weeks after a demand therefor.

"4. As used herein, the terms 'general damages,' 'special damages,' 'exemplary damages' and 'actual malice,' are defined as follows:

(a) '*General damages*' are damages for loss of reputation, shame, mortification and hurt feelings;

(b) '*Special damages*' are all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other;

(c) '*Exemplary damages*' are damages which may in the discretion of the court or jury be recovered in addition to general and special damages for the sake of example and by way of punishing a defendant who has made the publication or broadcast with actual malice;   .

(d) '*Actual malice*' is that state of mind arising from hatred or ill will toward the plaintiff; provided, however, that such a state of mind occasioned by a good faith belief on the part of the defendant in the truth of the libelous publication or broadcast at the time it is published or broadcast shall not constitute actual malice.''

[5]In his reply brief, the appellant states: "Under the guise of relating record facts concerning this plaintiff, the defendant cannot drag in *false and libelous statements* concerning his deceased wife, nor of himself.'' (Emphasis added.)

theory of the invasion of his right of privacy is to sanction an evasion of the provision of section 48a of the Civil Code.[6] If such recovery cannot be had in the case of libelous statements, no greater relief could be reasonably expected for statements in the challenged publication which are of a non-libelous character. Consequently, before the tort of the invasion of privacy can be found to extend as far as the appellant contends it does, it must be determined whether there is a public policy as to publication by newspapers expressed in section 48a which stands as a barrier, although no such barrier may exist insofar as some other kinds of publication are concerned.

Section 48a of the Civil Code provides in substance that in an action against a newspaper for libel, the plaintiff shall recover no more than special damages unless a demand for a correction has been made and an adequate correction has not been published in the newspaper. The constitutionality of that legislation was upheld by the Supreme Court in *Werner* v. *Southern California Associated Newspapers,* 35 Cal.2d 121 [216 P.2d 825, 13 A.L.R.2d 252]. In the course of the opinion it was said, at page 126: "There are at least two bases on which the Legislature could reasonably conclude that the retraction provisions of section 48a provide a reasonable substitute for general damages in actions for defamation against newspapers and radio stations, namely, the danger of excessive recoveries of general damages in libel actions and the public interest in the free dissemination of news.

"General damages are allowed for 'loss of reputation, shame, mortification and hurt feelings' (Civ. Code, § 48a), but the extent of such injuries is difficult to determine. . . . The Legislature could reasonably conclude that recovery of damages without proof of injury constitutes an evil."

In the Werner case, the Supreme Court further said, at pages 128-129: "Plaintiff contends, however, that no public interest is served by the publication of false news and that it is desirable to enforce full responsibility as a deterrent to careless or malicious publication. . . . Certainly there are forceful arguments in favor of the policy plaintiff advocates. . . . It is for the Legislature, however, to choose between conflicting policies, and this court may not presume that in reaching its decision it acted upon improper motives." And

---

[6] It is to be noted that in section 48a general damages are stated to be "damages for loss of reputation, *shame, mortification and hurt feelings."* (Emphasis added.)

at page 134: "Although it extends its protection to those who may deliberately and maliciously disseminate libels, the Legislature could reasonably conclude that it was necessary to go so far effectively to protect those who in good faith and without malice inadvertently publish defamatory statements." As to the effect and value of a proper retraction, the Supreme Court adopted the following language (p. 133): " 'Now, as far as vindication of character or reputation is concerned, it stands to reason that a full and frank retraction of the false charge, especially if published as widely and substantially to the same readers as was the libel, is usually in fact a more complete redress than a judgment for damages.' "

In enacting section 48a of the Civil Code, the Legislature declared the public policy of the state. (See *Anderson* v. *Hearst Pub. Co.*, 120 F.Supp. 850, 855.) To extend the tort of invasion of privacy to the extent necessary to reach a determination that the appellant's amended complaint states a cause of action would be to ignore such declaration of public policy and to dilute the effect of such legislation. This court is not free to do so. If a remedy is available under such circumstances, it is in the field of the law of defamation, but the appellant has disclaimed any intention of pursuing such remedy.

While it may furnish little solace to the appellant, the language of *Kelley* v. *Post Publishing Co.*, 327 Mass. 275 [98 N.E.2d 286, at page 287], is apropos: "The law does not provide a remedy for every annoyance that occurs in everyday life. Many things which are distressing or may be lacking in propriety or good taste are not actionable."

The judgment is affirmed.

Vallée, Acting P. J., concurred.

BISHOP, J. pro tem.*—I dissent. Dean William L. Prosser, in his article on *Privacy,* published in the August 1960 issue of the California Law Review, makes this statement (48 Cal. L.Rev. 418): "One troublesome question, which cannot be said to have been fully resolved, is that of the effect of lapse of time, during which the plaintiff has returned to obscurity." The rule to govern in this state, in the absence of legislation, is being developed in the customary fashion; that is, as cases arise, each is decided upon its facts. The final decision in this case should, I believe, recognize the limitation in comment c,

---

*Assigned by Chairman of Judicial Council.

section 867, Restatement of the Law of Torts, where, speaking of those who have sought the public eye, as does a candidate for public office, and of those unwillingly brought into public view, charged with crime, it is said: "Both groups of persons are the objects of legitimate public interest *during a period of time after* their conduct or misfortune has brought them to the public attention; *until they have reverted to the lawful and unexciting life led by the great bulk of the community,* they are subject to the privileges which publishers have to satisfy the curiosity of the public as to their leaders, heroes, villains and victims." (Emphasis added.)

The courts of this state have already taken a decisive step in writing the rule. The plaintiff, in *Melvin* v. *Reid* (1931), 112 Cal.App. 285 [297 P. 91], had been a prostitute and was the central figure in a murder trial. Acquitted of the murder charge and having quit her immoral life, she was enjoying a life of obscurity when the defendant, some eight years later, to entertain the public, brought the past to life in a motion picture. The court, reversing the judgment that followed the sustaining of a demurrer, stated (p. 292): "We believe that the publication by respondents of the unsavory incidents in the past life of appellant after she had reformed, coupled with her true name, was not justified by any standard of morals or ethics known to us and was a direct invasion of her inalienable right guaranteed to her by our Constitution, to pursue and obtain happiness. Whether we call this a right of privacy or give it any other name is immaterial. . . ."

It has been pointed out that "The dividing line between the individual right and the so-called public right is not easily drawn and must be determined in every instance by the facts of each case." (*Stryker* v. *Republic Pictures Corp.* (1951), 108 Cal.App.2d 191, 194 [238 P.2d 670, 671, 672].) In the case now under review, plaintiff's prospective marriage was news, but much of the rest of the story had no relevancy whatever to the news; that was but the occasion for digging up the unsavory past, much of it over 20 years old. It is my conviction that this court should not hold that in the conflict between plaintiff's right of privacy and the admitted right of the defendant to print that which some, perhaps many, of its subscribers will avidly read, the former must give way under the facts of this case. The judgment should be reversed.

Appellant's petition for a hearing by the Supreme Court was denied August 9, 1961. Schauer, J., Peters, J., and Dooling, J., were of the opinion that the petition should be granted.