[Civ. No. 69. Fifth Dist. Mar. 23, 1962.]

JOHN KENNETH CARLISLE, Plaintiff and Appellant, v. FAWCETT PUBLICATIONS, INC., et al., Defendants and Respondents.

734

Kane & Canelo and Martin J. Rosen for Plaintiff and Appellant.

Pacht, Ross, Warne & Bernhard and Jerry Pacht for Defendants and Respondents.

CONLEY, P. J.—Based on an article appearing in the magazine, *Motion Picture,* the plaintiff sued the defendants, Fawcett Publications, Inc., a corporation, Schroeder News Company, a corporation, and Janett Helen Morrison, also known as Jeanette H. Morrison, also known as Janet Leigh, in two counts, the first alleging libel and the second invasion of privacy. The defendants filed a general and special demurrer to the complaint; after argument, the trial court sustained the general demurrer as to each and both causes of action without leave to amend; judgment of dismissal was entered and the plaintiff appealed.

The publication complained of is the leading article in the December 1960 issue of *Motion Picture.* The standard of taste and intelligence exemplified by the magazine is sufficiently indicated by the table of contents, which includes, besides the piece in question, a listing of the following "exclusive stories" concerning moving picture actors and actresses: Sherry Jackson, " 'Why I Ditched Elvis Presley' "; Susan Kohner, " 'When I Think of Marriage, I Think of George' "; George Hamilton, " 'Trouble Is, I Don't Want to Get Married' "; Troy Donahue, "They Made Me a Criminal"; Tuesday Weld, "The Girl Who's So Far Out She's In!"; Nancy and Tommy Sands, "You Are Cordially Invited to the Wed-

ding"; Glenn Ford, "The Last of the Red Hot Playboys"; Doug McClure, "The Astonished Heart of Doug McClure"; Brad Dillman, "Any Guy Who Stays Single Is a Jerk"; Liz Taylor, "Liz Has a New Love!"; Esther Williams, " 'I *Didn't* Break Up Fernando's Marriage!' " Some cynic has said: "Widespread literacy is not an unmixed blessing."

Turning to the article itself on page 19 of the issue, we find the title, "Janet Leigh's Own Story—'I Was a Child Bride at 14!' ", with the picture of the actress appended. The composition deals with the life story of Miss Leigh, a well-known moving picture actress; it seems clearly intended to improve her rating with moving picture "fans," as well as to build up the circulation of the magazine; it includes the following excerpts:

"For the small tawny-haired blonde and the lean, dark boy their world was coming to an end that desperate summer. They put their arms around each other in the dark and held tight, afraid.

"The world itself was headed for disaster those warm days in 1941—to Pearl Harbor and World War II, to Hiroshima and the atomic bomb—but the boy and the girl were in love and very frightened.

" . . . . . . . . . .

"That summer in Merced, a small town south of San Francisco with only one motion picture theater, Jeanette Morrison—the girl who was to become Janet Leigh—was 14. The dark boy we'll call 'John' was 18.

" *'Never make fun of young love,'* Janet Leigh says today.

" *'Never laugh at it.'*

" *'I might have become a tramp,'* says Janet Leigh.

"Today, she is an April girl, as fresh as a happy morning, a warmly adoring young mother, friendly, clear-eyed, forthright. Sometimes, she seems as innocently wiggly and eager to please as a blonde kitten. But sometimes—sometimes—you look in her eyes and they darken, and she seems far away, and wise, and careful.

"For what seems at first glance to be a smiling story of boy-girl teen-age infatuation, of sex impulses shy and decent and wondering, might have been—and so nearly was—a psychological disaster.

" *'I was hurt. I might have become a tramp,'* says Janet. *'You know what I mean. Or I might have become a frigid woman, afraid of men.'*

" . . . . . . . . . . .

"This is the story that Janet kept secret so many years, afraid to tell it. Now, she has resolved the deeply psychological effects of young shame and fear. She understands them well. She knows them technically because only a short time after that hurtful marriage she became a brilliant student of psychology in a first-rate college. There, from time to time, in books and lectures, she saw herself in the dark mirror of the subconscious first revealed by Sigmund Freud.

"Today, Janet looks back objectively, almost clinically, to the bewildered, frightened girl she was at 14, as if that little girl was another person, or case history, or someone she read about long ago.

"But she does not laugh."

The biographical piece states that Miss Morrison was an only child with "bright hair burnished until it shone like a splash of sunlight," and that she was "the brightest kid in school" at Stockton. Some of the alleged history of her family is then set forth, and more of the characteristics of the actress. Her family moved to Merced from Stockton.

"The complex in Merced began with love and sex. She met the boy, John, in Merced because her parents moved there briefly, from Stockton, when her grandfather died.

" . . . . . . . . . . .

"She was the youngest student in her class, as always, and the brightest, as always. She was too young to have 'car dates.' But the kids were unusually friendly in Merced in 1941. They liked Jeanette and accepted her—not at once, but slowly, as she proved she was 'regular.'

"She 'went steady' with John. He was a tall, handsome fellow and a senior. Jeanette wore his letterman sweater and around her neck was a thin gold chain from which dangled his class ring.

"The precocious 14-year-old girl from out of town, popular but not sure of herself, not yet really one of the gang, had found security and affection in an older boy. Jeanette Morrison fell utterly in love.

"They kissed. And for the first time in her very young life Jeanette knew what a kiss meant."

The family moved back to Stockton, but another girl asked her back to Merced for a two weeks' visit in the following summer and ". . . tall John, looking diffident and embarrassed and very eager, . . ." was at the station to meet her.

"It was all fun at first—sheer fun and teasing, romping, dating, playing. There were picnics and lunches on the banks

of the Joaquin River. There were lazy warm days in the sun, swimming or napping in the shade. Then, as afternoons wore out, they'd race back to town to Merced's one movie house before five o'clock, when the prices went up.

"John and Jeanette sat close in the dark, hand-holding, smuggling kisses, watching the glamorous people on the screen, hooting at the comedies and associating themselves with the lovers in love scenes.

"It was a lovely summer time. Then time ran out.

"'Only a couple more days, then you'll go home and I won't see you again,' said John.

"'I know. I've *got* to stay here,' said Jeanette. 'What can we do?'

"Late at night, she and her girl friend sat up in bed talking about the problem that had no solution: how could 14-year-old Jeanette live in Merced when her parents lived in Stockton?"

Either her feminine friend or one of the principals concocted the marriage scheme, and John said that they could go to Reno, 200 miles away, that he would borrow the family car, and that if they drove there nobody would ask any questions; they could get married and then they could return and live with his mother and father and go to school, so that she would not have to leave Merced.

The article continues:

"That was how it was—not on a binge (nobody drank; they knew they were too young for that), not on a dare, not in defiance of authority. The three kids worked out a problem the best they could and marriage was their answer.

"Only Jeanette's girl friend knew what was up. Jeanette packed a little bag and hid it. John 'borrowed' the family car—he had none of his own—and suddenly and solemnly they were off to Reno to get married.

"They were silent most of the way. Jeanette—always good at problems in books, remember—began to do sums in her head. 'I'm supposed to be eighteen,' she said to herself, 'so it's 1941 now, and that means I was born in 1923, only I was really born in 1927. July 6, 1927. I've got to remember to say 1923 when the man asks me. But how'll I prove it?'

"They parked near the court house, walked up the steep steps as self-consciously as if they were mounting a stage with an audience watching, and stammered their way to the marriage license bureau.

"Jeanette spoke so softly that the man had to ask twice when he came to her age. But he didn't look up, didn't chal-

lenge her, didn't demand proof. Marriage, divorce and gambling are Reno's business. They don't discourage business if they can help it.

"They went through the next step, the marriage itself, like robots. Later, neither Jeanette nor John could recall where they were married, by whom, or who stood up with them as a witness. They know that a justice of the peace mumbled a hurried ceremony, declared them man and wife according to the laws of the state of Nevada, and pocketed John's crumpled three dollars with a grunt.

"Then they walked out into the clear Reno sunshine and stared at each other.

"They thought first of telephoning Jeanette's girl friend in Merced. They did that, almost hysterically, and made the girl friend promise not to tell—certainly not to inform a parent. Then they sought a small hotel for their quick little honeymoon.

"Registering under the eye of a bored room clerk who couldn't have cared less was the most embarrassing part. After that, they were alone and in each other's arms.

" '*Never laugh at young love.*'

"It was, for the short frustrating time they had, a marriage. One night, and they had to return to Merced and face adult authority. They began to have misgivings."

The annulment followed.

When the young woman returned to Stockton she was much perturbed.

"She thought that everybody knew all about her and was talking. Some did know—one way or another, stories like this get out—and they did talk.

" '*What kind of girl do they think I am now? What do boys think when they look at me? What will they do on a date?*'

"From history class to cafeteria, she felt curious eyes upon her. When kids whispered, she thought they were whispering about her.

" '*I was suspicious of every boy who touched my hand. I was embarrassed and ashamed. I was uncomfortable on dates, wondering what the boy might think of me. Fair game. Easy. This was a turning point. Right then I might have become a tramp.*'

" '*Or I might have withdrawn in fear. And I might have become frigid, afraid of all men all my life.*'

"Sunny, effervescent Janet Leigh ashamed and bewildered

is a difficult picture to imagine, but the destruction of her first marriage, as if she had done something unspeakable, had precisely that traumatic effect when she was 14. She became withdrawn and furtive, shy for the first time in her life.

"Jeanette became diffident in school. She avoided the normal, honest advances of boys who wanted to take her out.

"But here now is a name that has never been mentioned in print before in connection with Janet Leigh. Here is his true name, and it may be that next to the name of Tony Curtis, it is the most important masculine name in her life: Dick Deane."

The article continues by relating the history of Miss Leigh's second and third marriages and her apotheosis amidst the gilt and glitter of Hollywood.

The first cause of action charges libel against all of the defendants. It alleges that on or about the 1st day of December, 1960, in Merced, California, defendants published the magazine article above referred to, a copy of which is attached to the complaint. The complaint continues, ". . . that said publication concerned the plaintiff, JOHN KENNETH CARLISLE, who was referred to therein as 'The dark boy we'll call John,' and was so intended by defendants, and each of them, and was so understood by numerous readers to refer to the plaintiff."

By way of innuendo, the complaint states: "That by the publication of said libelous article, the defendants, and each of them, intended to charge, and did in fact charge, and were understood by numerous persons who read said article to charge, that the plaintiff, JOHN KENNETH CARLISLE, was and is a tramp, a vagabond and a depraved and predatory male, who conspired to, and did in fact abduct and exploit a young maiden of the age of fourteen years, and who was capable of causing and did in fact attempt to cause said maiden to become a frigid woman afraid of men and ashamed of her relationship with plaintiff; and further, that plaintiff was and is either mentally defective or adicted [sic] to the use of drugs or narcotics, by reason of which he went through a marriage ceremony like a robot, without knowing where he was married or by whom."

It is then alleged that the defamatory statements are false and libelous and that the publication ". . . is calculated to and does hold plaintiff up to ridicule, contempt, infamy and disgrace and has caused plaintiff to be shunned and avoided; . . ."; that the defendants knew that the statements were

false and untrue and that they were actuated by actual malice, ill will and hatred, and that the publication was made ". . . with the intent and purpose of injuring plaintiff personally, socially and financially, . . ." in his home community, Merced. Actual damages are claimed in the sum of $1,000,000 and punitive damages in the additional amount of $1,000,000, and special damages are also alleged because plaintiff's income as a salesman has been reduced from $1,000 per month to approximately $175 per month.

The respondents' claim that the plaintiff was not sufficiently identified appears to us to lack merit. His Christian name, John, was used. He was described as "a tall, handsome fellow and a senior" and an athlete in the only high school in the relatively small city. His general complexion or hair color was "dark." He was the young man who married the moving picture actress later known as Janet Leigh whose name was Jeanette Morrison when she attended high school.

"A publication may clearly be defamatory as to somebody, and yet on its face make no reference to the individual plaintiff. In such a case the plaintiff must sustain the burden of pleading and proof, by way of 'colloquium,' that the defamatory meaning attached to him. If he fails to do so, he has not made out his case. He need not, of course, be named, and the reference may be an indirect one; and it is not necessary that every listener understand it, so long as there are some who reasonably do." (Prosser on Torts (2d ed. 1955) § 92, p. 583.)

Section 460 of the Code of Civil Procedure provides as follows: "In an action for libel or slander it is not necessary to state in the complaint any extrinsic facts for the purpose of showing the application to the plaintiff of the defamatory matter out of which the cause of action arose; but it is sufficient to state, generally, that the same was published or spoken concerning the plaintiff; and if such allegation be controverted, the plaintiff must establish on the trial that it was so published or spoken."

As is said in *Washer* v. *Bank of America,* 21 Cal.2d 822, 829 [136 P.2d 297, 155 A.L.R. 1338] : "It was merely necessary for the appellant to plead, as he did, that the words were spoken of and concerning him." (See also *Williams* v. *Seiglitz,* 186 Cal. 767 [200 P. 635] ; *Harris* v. *Zanone,* 93 Cal. 59 [28 P. 845] ; *Semple* v. *Andrews,* 27 Cal.App.2d 228 [81 P.2d 203] ; *Dewing* v. *Blodgett,* 124 Cal.App. 100 [11 P.2d 1105] ;

*Jimeno* v. *Commonwealth Home Builders,* 47 Cal.App. 660 [191 P. 64] ; *Bohan* v. *Record Pub. Co.,* 1 Cal.App. 429 [82 P. 634] ; *Schomberg* v. *Walker,* 132 Cal. 224 [64 P. 290].)

It was the duty of the court below to examine the article claimed to be libelous together with the pleaded innuendo. If the meaning set forth in the innuendo could reasonably be attributed to the article, the demurrer should have been over-ruled so that the jury could later determine what was actually meant by the publication. On the other hand, if only a non-libelous meaning could be fairly attributed to the article, it was the duty of the court to sustain the demurrer.

In *MacLeod* v. *Tribune Pub. Co.,* 52 Cal.2d 536, 546 [343 P.2d 36], the respective functions of court and jury in cases of this kind are thus stated: "Whether or not the article is reasonably susceptible of this interpretation is a question for the court and, if so, whether or not it was so understood is a question for the jury. (*Maher* v. *Devlin,* 203 Cal. 270, 278 [263 P. 812] ; *Mellen* v. *Times-Mirror Co.,* 167 Cal. 587, 593 [140 P. 277, Ann.Cas. 1915C 766] ; *Keenan* v. *Dean,* 134 Cal. App.2d 189, 195 [285 P.2d 300] ; *Gallagher* v. *Chevalas* [*sic*], 48 Cal.App.2d 52, 58 [119 P.2d 408].)''

In *Mellen* v. *Times-Mirror Co.,* 167 Cal. 587, 593 [140 P. 277, Ann.Cas. 1915C 766], the Supreme Court makes the following statement: "It cannot be disputed that it is for the court to determine whether, in the light of such extrinsic facts as are alleged, the writing can be a libel. If, in the light of such extrinsic facts, the article is not fairly susceptible of the defamatory meaning sought to be attributed to it, the complaint fails to state a cause of action. Of course, if the language of the article is capable of two meanings, one of which is harmless and the other libelous, and it is alleged that the same was used and understood as conveying the latter meaning, a cause of action is stated, and it is the province of the jury to determine in which sense the language was used and understood by the readers of the article. But it is for the judge to determine whether the language used is capable of the defamatory meaning claimed for it by the plaintiff. (See *Van Vactor* v. *Walkup,* 46 Cal. 124, 133.)''

*Bates* v. *Campbell,* 213 Cal. 438, 442 [2 P.2d 383] says: "Should the alleged libelous publication be ambiguous and susceptible of two meanings, one of them harmless and the other injurious, it is necessary for the plaintiff to plead by innuendo the facts upon which he relies to point out the in-jurious meaning of the writing. (*Mellen* v. *Times-Mirror Co.,*

167 Cal. 587 [Ann.Cas. 1915C 766, 140 P. 277]; *Ousdal* v. *Sansum*, 86 Cal.App. 119, 122 [260 P. 322]; *Vedovi* v. *Watson & Taylor*, 104 Cal.App. 80, 84 [285 P. 418].) However, it is not the purpose of an innuendo to 'beget an action,' and the meaning of the language complained of may not be enlarged or extended thereby. (*Chavez* v. *Times-Mirror Co.*, 185 Cal. 20, 25 [195 P. 666]; *Grand* v. *Dreyfus*, 122 Cal. 58, 61 [54 P. 389]; *Hearne* v. *De Young*, 119 Cal. 670 [52 P. 150]; *Des Granges* v. *Crall*, 27 Cal.App. 313, 315 [149 P. 777].) In other words, it is the office of the innuendo to merely explain or interpret, without enlarging, the alleged libelous publication.''

In *Emde* v. *San Joaquin County etc. Council*, 23 Cal.2d 146, 159-160 [143 P.2d 20, 150 A.L.R. 916], it is said: ''An innuendo, however, cannot ascribe a meaning to assertedly defamatory matter other or broader than the words themselves naturally bear; it cannot add to, enlarge, or change the sense of the published words. [Citing cases.]''

''In the first instance, it is a question of law as to whether the words used are susceptible reasonably of a defamatory meaning. Unless the words used can reasonably be understood in a defamatory sense, the innuendo pleaded cannot aid the pleader.'' (*Keenan* v. *Dean*, 134 Cal.App.2d 189, 195 [285 P.2d 300].)

''. . . the general rule is that before a demurrer to a complaint containing innuendoes may be properly sustained it must appear that the publication is not reasonably susceptible of the defamatory meaning and cannot reasonably be understood in the defamatory sense pleaded; and that where the words used are susceptible of more than one meaning, one of which is the libelous meaning placed upon them by the plaintiff in the allegations of his complaint, then the question of whether the words are defamatory or of innocent import should be left to the jury for determination under proper instructions, even though the covert meaning ascribed to them be improbable.'' (*Gallagher* v. *Chavalas*, 48 Cal.App.2d 52, 58 [119 P.2d 408].) (See also *Pollard* v. *Forest Lawn Memorial Park Assn.*, 15 Cal.App.2d 77, 81 [59 P.2d 203]; *Vedovi* v. *Watson & Taylor*, 104 Cal.App. 80, 88 [285 P. 418].)

We have carefully considered the magazine article and have reached the conclusion that it does not and cannot have the meaning stated in the innuendo. The description

of the plaintiff as a "dark boy" refers obviously to his complexion or hair color, and his personal appearance is described rather attractively than otherwise; the allegation that he went through a marriage ceremony while he and the girl were minors does not expose the plaintiff to "hatred, contempt, ridicule or obloquy" or cause him to be "shunned or avoided" or have "a tendency to injure him in his occupation" (Civ. Code, § 45) in view of the current mores of the people of this state. The allegations that they put their arms around each other in the dark, that the plaintiff kissed her and that she knew for the first time what a kiss was, that they held hands and kissed at the moving picture show can scarcely be held to be libelous in the surrounding circumstances. The statement that a young man has kissed a willing and pretty girl is not generally considered degrading. "All the world loves a lover."

 Courts are, of course, loath to sustain demurrers to pleadings without leave to amend. If by any reasonable possibility the allegations of a complaint may be remedied to state a cause of action, our courts normally permit the filing of an amendment. (2 Chadbourn, California Pleading (perm. ed. 1961), § 1356, pp. 504-505.) In this case, however, it is clear to us, as it seemed clear to the trial court, that the magazine article complained of does not constitute libel and the ruling which prevented the filing of an amendment to the complaint was therefore correct.

 The right of privacy, first so named in an article in the Harvard Law Review, volume 4, page 193 et seq., by Samuel D. Warren and Louis D. Brandeis, is recognized and enforced in California and in most states throughout the country. (*Gill* v. *Curtis Pub. Co.,* 38 Cal.2d 273, 276 [239 P.2d 630]; *Coverstone* v. *Davies,* 38 Cal.2d 315, 322 [239 P.2d 876]; *Melvin* v. *Reid,* 112 Cal.App. 285 [297 P. 91]; Prosser, Torts (2d ed. 1955), § 97, p. 635 et seq.; Rest., Torts, § 867, p. 398 et seq.)

In the Harvard Law Review article (p. 196), the authors discuss the necessity for some such protection to the individual as follows: "The press is overstepping in every direction the obvious bounds of propriety and of decency. Gossip is no longer the resource of the idle and of the vicious, but has become a trade, which is pursued with industry as well as effrontery. To satisfy a prurient taste the details of sexual relations are spread broadcast in the columns of the daily papers. To occupy the indolent, column upon column is filled with idle gossip, which can only be procured by intrusion

upon the domestic circle. The intensity and complexity of life, attendant upon advancing civilization, have rendered necessary some retreat from the world, and man, under the refining influence of culture, has become more sensitive to publicity, so that solitude and privacy have become more essential to the individual; but modern enterprise and invention have, through invasions upon his privacy, subjected him to mental pain and distress, far greater than could be inflicted by mere bodily injury. Nor is the harm wrought by such invasions confined to the suffering of those who may be made the subjects of journalistic or other enterprise. In this, as in other branches of commerce, the supply creates the demand. Each crop of unseemly gossip, thus harvested, becomes the seed of more, and, in direct proportion to its circulation, results in a lowering of social standards and of morality. Even gossip apparently harmless, when widely and persistently circulated, is potent for evil.''

In a recent analysis of the many cases involving the right of privacy decided throughout the country, William L. Prosser, former Dean of the School of Law, University of California, in an article entitled *Privacy* (48 Cal.L.Rev., p. 383 et seq.), at page 389, states that ''The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff, in the phrase coined by Judge Cooley, 'to be let alone.' ''

Of these four, the plaintiff claims that he was wronged by a violation of two of them: (a) ''Public disclosure of embarrassing private facts about the plaintiff''; and (b) ''Publicity which places the plaintiff in a false light in the public eye.''

A consideration of the limits of the right of privacy requires the exercise of a nice discrimination between the private right ''to be let alone'' and the public right to news and information; there must be a weighing of the private interest as against the public interest. (*Barber* v. *Time, Inc.*, 348 Mo. 1199 [159 S.W.2d 291, 294].) It is clear that as current news occurs those involved in the happening may be named and discussed in newspapers or over the air even though the process actually invades the privacy of the individual. If a householder is burglarized, or a pedestrian is held up and robbed in the street, or two automobiles collide at an intersection, news media may properly give an

account of what happened even though the individual objects.
█ The freedom of the press is constitutionally guaranteed, and the publication of daily news is an acceptable and necessary function in the life of the community. (*Gill* v. *Hearst Pub. Co.*, 40 Cal.2d 224, 228 [253 P.2d 441]; *Gill* v. *Curtis Pub. Co., supra*, 38 Cal.2d 273, 277-279.)

█ The privilege of printing an account of happenings and of enlightening the public as to matters of interest is not restricted to current events; magazines and books, radio and television may legitimately inform and entertain the public with the reproduction of past events, travelogues and biographies.

█ If the necessary elements which would permit the publication of factual matter are present, mere lapse of time does not prohibit publication. (See *Werner* v. *Times-Mirror Co.*, 193 Cal.App.2d 111, 117 [14 Cal.Rptr. 208]; *Cohen* v. *Marx*, 94 Cal.App.2d 704 [211 P.2d 320]; Prosser, "Privacy," 48 Cal.L.Rev. 383, 418; *Leverton* v. *Curtis Pub. Co.*, 192 F.2d 974, 977; *Estill* v. *Hearst Pub. Co.*, 186 F.2d 1017, 1022; *Bernstein* v. *National Broadcasting Co.*, 129 F.Supp. 817, 828, 835; *Samuel* v. *Curtis Pub. Co.*, 122 F.Supp. 327; *Smith* v. *Doss*, 251 Ala. 250 [37 So.2d 118, 121]; Prosser, Torts (2d ed. 1955), § 97, p. 644.)

As is said in *Smith* v. *National Broadcasting Co.*, 138 Cal. App.2d 807, 814 [292 P.2d 600]: "It is a characteristic of every era, no less than of our contemporary world, that events which have caught the popular imagination or incidents which have aroused the public interest, have been frequently revivified long after their occurrence in the literature, journalism, or other media of communication of a later day. These events, being imbedded in the communal history, are proper material for such recounting. It is well established, therefore, that the mere passage of time does not preclude the publication of such incidents from the life of one formerly in the public eye which are already public property. [Citations.]"

Furthermore, there is a public interest which attaches to people who by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities. █ Certainly, the accomplishments and way of life of those who have achieved a marked reputation or notoriety by appearing before the public such as actors and actresses, professional athletes, public officers, noted inventors, explorers, war heroes, may legitimately be mentioned and discussed in print or on radio

or television. Such public figures have to some extent lost the right of privacy, and it is proper to go further in dealing with their lives and public activities than with those of entirely private persons. (*Metter* v. *Los Angeles Examiner*, 35 Cal.App.2d 304, 309 [95 P.2d 491]; *Sidis* v. *F-R Pub. Corp.*, 113 F.2d 806 [138 A.L.R. 15]; 138 A.L.R., p. 58; 168 A.L.R., p. 455.)

As is said in *Werner* v. *Times-Mirror Co., supra,* 193 Cal. App.2d 111, 117: "A person may, by his own activities or by the force of circumstances, become a public personage and thereby relinquish a part of his right of privacy to the extent that the public has a legitimate interest in his doings, affairs, or character." (See also *Smith* v. *National Broadcasting Co., supra,* 138 Cal.App.2d 807, 812; *Cohen* v. *Marx, supra,* 94 Cal.App.2d 704, 705; *Sidis* v. *F-R Pub. Corp., supra,* 113 F.2d 806-809 [138 A.L.R. 15].)

 A necessary corollary is that people closely related to such public figures in their activities must also to some extent lose their right to the privacy that one unconnected with the famous or notorious would have. If it be objected that the mere relationship with some public figure should not subject a person to a qualified loss of his privacy, the identical observation could be made logically as to the man held up on the street, the householder who is burglarized, or the victim of an accident; all may be equally unwilling to be publicized. (*Coverstone* v. *Davies, supra,* 38 Cal.2d 315, 323; *Metter* v. *Los Angeles Examiner, supra,* 35 Cal.App.2d 304; *Smith* v. *Doss, supra,* 251 Ala. 250 [37 So.2d 118]; *Kelley* v. *Post Pub. Co.,* 327 Mass. 275 [98 N.E.2d 286]; *Aquino* v. *Bulletin Co.,* 190 Pa.Super. 528 [154 A.2d 422]; *Jenkins* v. *Dell Pub. Co.,* 143 F.Supp. 952; *Hillman* v. *Star Pub. Co.,* 64 Wash. 691 [117 P. 594, 35 L.R.A. N.S. 595]; *Melvin* v. *Reid, supra,* 112 Cal.App. 285, 290.)

Another important element present in this case is the fact that the marriage of the defendant actress with the plaintiff and the later annulment are matters of public record. As shown by the pleading itself, the marriage took place on August 1, 1942, at Reno, Nevada, and on or about December 7, 1942, the complaint for annulment was filed in the Superior Court of Merced County; the judgment of annulment was granted December 28, 1942. In *Melvin* v. *Reid, supra,* 112 Cal.App. 285, 290-291, it is said:

. "The very fact that they were contained in a public record

is sufficient to negative the idea that their publication was a violation of a right of privacy. When the incidents of a life are so public as to be spread upon a public record they come within the knowledge and into the possession of the public and cease to be private.'' (See also *Smith* v. *National Broadcasting Co., supra,* 138 Cal.App.2d 807, 811, 812; *Werner* v. *Times-Mirror Co., supra,* 193 Cal.App.2d 111, 117.)

Appellant calls attention to errors contained in the article, the two principal ones being that the date of the marriage is put back approximately a year to the attack at Pearl Harbor, apparently for dramatic effect, and the age of the defendant actress at the time of marriage is reduced a year for the same reason. But the mere fact that there are errors in the account does not constitute an invasion of privacy. (*Koussevitzky* v. *Allen, Towne & Heath,* 188 Misc. 479 [68 N.Y.S.2d 779] ; 272 App.Div. 759 [69 N.Y.S.2d 432].)

It is further contended that the article is fictionalized and that because the publication is not restricted to a cold recital of the skeletal facts of the marriage and the annulment but fills in the gaps with the supposed conversations and thoughts of the participants, the article moves from the permitted to the improper. We do not believe that the imagination of the writer of the article as exercised here creates a tort that would not otherwise exist, and we call attention to the fact that there are no ''so-called revelations of any intimate details which would tend to outrage public decency.'' (*Koussevitzky* v. *Allen, Towne & Heath, supra,* 68 N.Y.S.2d 779; 69 N.Y.S.2d 432.)

While plaintiff is entitled to a sympathetic understanding of his desire not to have publicized the details of his early marriage, we must hold, for the reasons stated, that he has no cause of action for an invasion of his right of privacy. As is said in *Davis* v. *General Finance & Thrift Corp.,* 80 Ga. App. 708 [57 S.E.2d 225, 227] : ''. . . the protection afforded by the law to the right of privacy must be restricted to 'ordinary sensibilities' and not to supersensitiveness or agoraphobia. (41 Am.Jur., § 12, pp. 934-935.) There are some shocks, inconveniences and annoyancies [*sic*] which members of society in the nature of things must absorb without the right of redress.''

The judgment is affirmed.

Brown, J., and Stone, J., concurred.