Jacksonville State Bank appeals from two adverse judgments entered on jury verdicts in these two actions, which were consolidated for trial,[1] arising out of claims for breach of an indemnity agreement, fraud, and invasion of privacy. We affirm.
The tendencies of the evidence are as follows: Andre Barnwell went to the Jacksonville State Bank (hereinafter the bank) on October 30, 1981, and entered into an installment loan agreement with the bank. This loan was secured by two automobiles, a 1966 Chrysler Newport and 1973 Buick Century.
On April 23, 1982, Barnwell again went to the bank in order to secure the purchase money for a mobile home. Consequently, a second loan agreement was executed by the bank and Barnwell executed a second promissory note. Barnwell testified that a bank vice president and loan officer, Mike Harper, handed him some paperwork and stated, "[T]his pays off the cars." The automobiles owned by Barnwell were not pledged as security for the second loan, only the mobile home.
On September 8, 1982, Barnwell's mobile home was destroyed by fire. The home was not covered by casualty insurance.
The fire was reported to Harper the following day. After an examination of the loan file at the bank, Barnwell was told that the only collateral on the note was the mobile home and that the bank demanded *Page 865 
immediate payment in full. Barnwell failed to make any further payments on the note.
Thereafter, the evidence indicates, the bank began a series of harassing telephone calls to Barnwell, at his home and at his place of employment, ranging from twenty-eight to thirty-five in number. Barnwell was reprimanded by his work supervisor about the calls. After he requested that the bank not call him at work, the calls to his work place continued. Threats of garnishment were made, and Barnwell's mother was called by the bank.
On October 20, 1982, Mr. Noonan, a bank officer, contacted Nicholas Trevino, and requested that he repossess Barnwell's automobiles for the bank. Trevino first went to the bank, where he met with both Noonan and Harper, regarding Barnwell's automobiles. Harper and Noonan examined the Barnwell installment note and thereafter Harper told Noonan, "[Y]ou can't repossess that car, there's something wrong with the contract."
After the bank officer realized the bank had no security interest in the automobiles, someone altered the Barnwell installment note to add the automobiles as security.
Approximately three days after the original discussion with Harper and Noonan, Trevino was called back to the bank by Harper for purposes of getting the Barnwell automobiles. There, Trevino met with Noonan and was given a copy of the altered note and an indemnity agreement and was told, "[W]ell, you can pick up the car now."
Trevino went to Barnwell's place of employment and caused a great deal of commotion in an effort to obtain Barnwell's Buick. In front of other employees, Trevino called Barnwell a "dead beat" and a "son of a bitch" and threatened to use "whatever force was necessary" to secure Barnwell's car. Barnwell had not driven the automobile to work on that particular day and, consequently, Trevino was unable to repossess the automobile.
As a result of these encounters with the bank and Trevino, Barnwell was twice reprimanded on the job, developed an anxious condition, was hospitalized and required medication, and suffered from weight loss, nausea, and diarrhea.
Barnwell filed suit against the bank for, inter alia, invasion of privacy. Likewise, Trevino filed suit against the bank for fraud and breach of an indemnity agreement. The bank filed a counterclaim against Barnwell on the promissory note and its underlying obligation.
The jury returned a general verdict in favor of Barnwell and against the bank for the amount of $10,000, a general verdict in favor of Trevino and against the bank for the amount of $80,000, and a verdict in favor of Barnwell and against the bank on the counterclaim. The court entered judgments based on these verdicts.
The bank's timely motion for a new trial was denied. The bank appeals.
We choose to address initially the bank's challenge to the denial of its motion for a directed verdict on the invasion of privacy and fraud claims.
Alabama recognizes that a person has an actionable right to be free from the invasion of privacy. Norris v. Moskin Stores,Inc., 272 Ala. 174, 132 So.2d 321 (1961). The debtor-creditor aspect of this right has been characterized as:
 "`the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.' . . ."
Smith v. Doss, 251 Ala. 250, 253, 37 So.2d 118 (1948) (quoting with approval 41 Am.Jur. Privacy, § 2 p. 925 (1942)).
The court has previously recognized the right of a creditor to take reasonable action to pursue a debtor and collect a debt. Norris v. Moskin Stores, Inc., 272 Ala. at 174,132 So.2d at 323. Accord, Hart v. General Motors Acceptance Corp.,437 So.2d 1255 (Ala. 1983). Where the creditor takes actions which exceed the bounds of reasonableness, however, the debtor has an *Page 866 
action against the creditor for injuries suffered. Norris,supra.
We find the tendencies of the evidence in this case, when viewed in a light most favorable to the plaintiff, support a finding that the bank far exceeded the bounds of reasonableness in its efforts to collect the Barnwell debt. Twenty-eight to thirty-five phone calls to one's home and place of employment fall within the realm of a "systematic campaign of harassment," a tactic admonished by this court in Norris, citing with approval Housh v. Peth, 99 Ohio App. 485, 135 N.E.2d 440
(1955), affirmed, 165 Ohio St. 35, 133 N.E.2d 340 (1956). Futhermore, Trevino's remarks at Barnwell's place of employment, as the bank's agent, unequivocally constitute coarse, inflammatory, malicious, and threatening language. SeeLasalle Extension University v. Fogarty, 126 Neb. 457,253 N.W. 424 (1934). Most importantly, fraudulently altering the terms of a security instrument in order to attempt to collect a debt flies in the face of reasonableness, public policy, and the law. The jury was warranted in finding these actions on the bank's part were outrageous to a person of ordinary sensibilities.
The bank contends that no evidence was presented suggesting Trevino was an agent of the bank. To the contrary, Trevino was given a letter of authorization by the bank which stated the bearer was authorized by the bank to repossess Barnwell's automobiles and would be protected by the bank from any and all claims arising from the repossession. Likewise, Barnwell testified that Trevino introduced himself by commenting, "I work for Jacksonville State Bank." Further, the record shows Trevino added, "I'm authorized to use whatever force is necessary to get the car." None of this testimony was objected to at trial. Under these facts, an issue of fact was created concerning whether Trevino was an agent of the bank and whether he was acting within the scope of that agency in his encounters with Barnwell.
In any event, the record raises issues of fact regarding whether the actions of the bank, independent of Trevino's, constituted a campaign of harassment and were beyond the bounds of reasonableness, giving rise to liability for invasion of privacy.
Likewise, evidence was presented showing that the bank intentionally misrepresented material facts to Trevino, upon which he relied, proximately causing him economic injury. Accordingly, genuine issues of fact were presented, justifying submission of the fraud count to the jury. InternationalResorts, Inc. v. Lambert, 350 So.2d 391 (Ala. 1977).
For example, the facts show that the bank, through Noonan and Harper, represented to Trevino that they possessed a valid security instrument naming Barnwell's automobiles as security. The jury was entitled to infer that the bank knew the representation was false because the instrument had been altered so as to include the automobile. Relying on the material misrepresentation, Trevino proceeded to Barnwell's place of employment in an effort to repossess the cars. As a proximate cause of the bank's misrepresentation, the evidence supports a finding that Trevino suffered significant economic injury.
The appellants accurately point out that the misrepresentation proven was not that pleaded. In support of this argument, our attention is drawn to the pleadings, where a misrepresentation concerning an indemnity agreement is alleged.
Alabama R.Civ.P. 15 (b) allows the automatic amendment of the pleadings where, as here, issues not raised by the pleadings are tried with the express or implied consent of the parties. In this vein, we note that the jury was charged, without objection, in terms of representations regarding Barnwell's security instrument and underlying promissory note.
Accordingly, we find that genuine issues of fact were raised on both Barnwell's invasion of privacy count and Trevino's fraud count and, therefore, the bank's motions *Page 867 
for a directed verdict on those counts were properly denied.
Next, the bank argues that the breach of indemnity count was improperly submitted to the jury, in that the common law prohibits the indemnification of intentional wrongdoers. In support of this argument, the bank emphasizes that Trevino was sued in slander, an intentional tort.
The general rule is that any indemnification contract which purports to indemnify a tortfeasor from an intentional tort is void as against public policy. Fidelity-Phenix Fire InsuranceCo. of New York v. Murphy, 226 Ala. 226, 146 So. 387 (1933). Cf. Industrial Tile, Inc. v. Stewart, 388 So.2d 171 (Ala. 1980), cert. den., 449 U.S. 1081, 101 S.Ct. 864, 66 L.Ed.2d 805
(1981) (indemnification of tortfeasor's negligence upheld). However, where the wrongdoer's trespass to another's rights is merely technical or constructive, and entered into without any unlawful design, or notice that the action was wrong, and is abona fide attempt to assert the rights of a principal, the promise of indemnity is a good and valid one. Vandiver v.Pollak, 107 Ala. 547, 19 So. 180 (1895). Cf. Mallory S.S. Co.v. Druhan, 17 Ala. App. 365, 84 So. 874 (1920).
Here, Trevino's comments to Barnwell that he was a "deadbeat" and a man "who would not pay his bills and debts" were not known to Trevino to be false and malicious, but, rather, based on the bank's representations, were honestly stated in an effort to enforce the bank's purported right of repossession upon default.
The evidence was in dispute concerning whether Trevino called Barnwell a "sorry son of a bitch," and therefore the jury could have believed that Trevino made no slanderous remarks with knowledge of their falsity.
Additionally, Trevino's breach of indemnity action was not premature, because the agreement covered him from all losses arising out of his efforts to repossess Barnwell's automobiles. This would include attorney's fees, which Trevino had already suffered at the time of filing suit.
Lastly, the record contains sufficient evidence that the bank fraudulently altered the Barnwell note, in its material aspects, and for a fraudulent purpose. Accordingly, the jury was justified in finding for Barnwell on the underlying obligation, as the debt was discharged by the bank's actions. Code 1975, § 7-3-407 (2)(a); Logan v. Central Bank of Alabama,N.A. 397 So.2d 151 (Ala.Civ.App. 1981).
Based on the foregoing, the judgments entered by the trial court are due to be, and they are hereby, affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, SHORES and BEATTY, JJ., concur.
[1] For purposes of clarity, the procedural steps taken in this case must be tracked chronologically: On December 10, 1982, Barnwell filed an action against Jacksonville Bank in Calhoun County Circuit Court. The Bank counterclaimed against Barnwell on January 19, 1983. Barnwell amended his complaint on February 8, 1983, to include a claim against Trevino. Trevino filed a separate action against the Bank in Etowah County Circuit Court. These two separate cases, Trevino's claim in Etowah County and Barnwell's claim in Calhoun County, were joined for trial upon motion of the Bank in Calhoun County Circuit Court.